COMMONWEALTH vs. ARNOLD M. COLITZ.

Middlesex.  October 16, 1981. — February 22, 1982.

Present: PERRETTA, ROSE, & DREBEN, JJ.

*Arrest. Probable Cause.*

A trial judge erred in allowing the defendant's motion to suppress two checks and $800 in marked bills taken from him at the time of his arrest on the ground that the police officers lacked probable cause, where the individuals who had requested the police to arrest the defendant had information constituting probable cause and had related that information to the officers at the time of the arrest. [222-224]

COMPLAINT received and sworn to in the Somerville Division of the District Court Department on December 24, 1980.

A motion to suppress was heard by *Tempone*, J.

*Michael E. Festa*, Assistant District Attorney, for the Commonwealth.

*John C. McBride* for the defendant.

PERRETTA, J.  Pursuant to Mass.R.Crim.P. 15(a)(2), 378 Mass. 882 (1979), the Commonwealth appeals from a decision of a District Court judge allowing the defendant's motion to suppress two checks and $800 in marked bills taken from his person at the time of his arrest.  Citizens acting with probable cause to believe, but without actual knowledge, that the defendant had taken over $100 from Osco Drug, Inc., see G. L. c. 266, § 30, requested the police to arrest the defendant.  The judge found that "the arrest was made by or at the direction of the police" but that they had acted without probable cause.  We hold that the arrest and the search were valid, and we reverse the order allowing the motion to suppress.

Keeping in mind that "'[w]e cannot properly be asked to revise a judge's subsidiary findings of fact, where they are warranted by the evidence, or to review the weight [or credibility] of the evidence related to the findings,'" *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980), we summarize the evidence which supports the judge's findings that the citizens had knowledge of facts constituting probable cause and that the defendant's arrest was a police arrest.

In 1980, the defendant was a manager of the Osco store in Medford, where one Donna Maloney was also employed. She testified that she worked in the cash room office. Included among her daily responsibilities were the tasks of giving cashiers fifty dollars with which to open their registers and the preparation of "end-of-the-day" reports. These were itemizations of all the checks, charges, and cash transactions for the day. Maloney would then balance the total amount of actual cash received against the cash transactions shown on the report. In addition, Maloney would also perform "picks" throughout the day: whenever there was over $200 in a register till, the cashier would band the money, place it in a box beneath the register, and Maloney would periodically pick it up. By hitting a certain button on the register terminal located in the cash room office, Maloney could see and record the amount of cash in each register on the store floor at any given time. She would get these figures just before going to the registers to pick up the bands of money which she would bring to the cash room. Maloney would next count the money and record the amount on a tally sheet as well as on her register terminal. She would then place the money on a shelf in the safe in the cash room. There were about five or six managers at the store, including the defendant, who had access to the cash room and to the register terminal in the manager's office.

On December 3, 1980, after doing her second "pick" of the day, Maloney discovered that the amount of cash she had retrieved on the two "picks" was $400 less than the amount reflected on her tally sheet. She was unable to

discover the cause for this discrepancy that day. The next morning she was rechecking her records when her attention was attracted to her register terminal. Whenever a "void" is entered on any register in the store, the transaction is reflected on her register terminal. It was then indicating that a $400 void was being entered on the register terminal located in the manager's office. That register was used to monitor sales taking place throughout the store, no money was kept in that register, and it was not authorized for use for void transactions. Maloney related her observations to a coworker, one Cindy Gianquitto. Gianquitto had knowledge of the cash room procedures, and Maloney, whenever leaving the room to do her "picks," would advise Gianquitto as to how much money was in the room. On December 10, 1980, her suspicions aroused, Maloney reported the incident to two men employed in Osco's loss prevention unit, Tom Gender and Ted Lorentzen. She reviewed the records of all void transactions for the previous three weeks, and these records indicated that during that time period, approximately $10,000 in void transactions had been entered at the store. The next day she met with Gender and Lorentzen, and she brought these records with her.

About 11:45 A.M. on December 12, 1980, Maloney saw that her register terminal was reflecting that a $400 void was being entered on the register terminal in the manager's office. She immediately hit the button on her terminal to obtain and to record a reading of the amount of cash in each register on the store floor. As she did this, she also telephoned to an upstairs office, but no one answered. She then called the manager's office, the location of the register terminal on which the $400 void was entered, and the defendant answered the phone. She reported the incident to Gender at his Cambridge office. At about 1:30 P.M., that day, Maloney saw on her register terminal that another $400 void was being entered on the register terminal in the manager's office. She notified Gender of this fact, and the vice-president of the loss prevention unit, one Ron Green, decided that the money in the cash room safe should be

marked. Maloney and Gianquitto marked between four and six thousand dollars with a red pen, recorded the amounts, returned the money to the safe, and left the cash room. Maloney stated it was then about 2:30 P.M. At about 3:20 P.M., to her best estimate, Maloney was on the store floor by the cash registers waiting for a cashier to arrive so that Maloney could give her $50 with which to open her register before she (Maloney) left for the day. The defendant approached and asked Maloney what she was doing. She told him, and he informed her that he had already seen the cashier and that he had given her the money.

Gianquitto testified that about ten minutes after marking the bills and leaving the cash room, she saw that one of the cashiers had arrived and that she had her fifty dollar "till" with which to open her register. Gianquitto knew that neither she nor Maloney had given any money to this cashier. She returned to the cash room, counted the marked bills in the safe, discovered that $800 was missing, and proceeded to the front of the store to speak with Maloney.

Lorentzen testified that after analyzing the void transactions information provided by Maloney, he, Green, and Gender met with her at about 3:00 P.M., on December 12, 1980, at the Osco parking lot. Maloney informed them that money was missing from the safe.[1] Gender and Green entered the store, met the defendant, and they proceeded to a security office. Green told the defendant about the void transactions and the missing money. He told the defendant that he believed that the defendant had the missing money on his person. When the defendant asked Green what he was talking about, Green asked him and Gender to leave the security office so that he could telephone an Osco official. As the two men turned and left the office, Green saw the defendant "shuffling" with the back pocket of his trousers,

---

[1] In arguing that there was no probable cause to arrest, the defendant emphasizes the different time estimates given by the witnesses. However, it is the sequence of these events rather than the precise times of their occurrence that is critical.

and Green saw "something like a lump" in that pocket. He yelled to Gender, "He's got it with him," and Gender brought the defendant back into the office. Green again asked the defendant to cooperate with them, but the defendant denied knowing what they were talking about. The Medford police were then called.

Officer Alpers testified that he and Officer Chiampi arrived at the Osco store some time after 3:30 P.M. but before 5:00 P.M. They were met by Gender who "explained a situation" to them, and Alpers immediately called his supervisor, Sergeant Padula.

Padula testified that when he arrived, Gender informed him that he believed that the defendant had on his person $800 in marked bills which the defendant had taken from the cash room. Padula further testified that he asked Gender for the basis of his belief, and Gender told him "something to do with cash register receipts and refunds and shortages in the money room on a daily basis that they were investigating." Padula related that "most of the information that [Gender] was providing me at the time was of a bookkeeping or accounting nature, and was a little over my head." Indeed, Padula stated that Gender explained the "bookkeeping matters" to him, but he doubted whether he could "relate [the information] to having probable cause to make an arrest." Padula suggested to Green and Gender that they could make a citizen's arrest.

The testimony of Green, Gender, Alpers, and Padula varies as to the specifics of the defendant's arrest, but there is testimony which supports the judge's finding, contained in his memorandum of decision on the Commonwealth's motion for reconsideration, that the arrest was made by or at the direction of the police.[2] After Padula suggested that

---

[2] In hearing arguments of counsel at the close of the evidence at the hearing on the motion to suppress, the judge stated: "[T]he issue in this case, therefore is: may a police officer arrest. That is not the issue, because we all agreed that the police officer did not arrest." In his memorandum of decision on the Commonwealth's motion for reconsideration, heard some two months later, the judge found that the defendant's arrest was made by the police. We take this subsequent finding as superseding the judge's earlier finding.

a citizen's arrest could be made, Green asked Padula to place the defendant under citizen's arrest for larceny. The testimony is consistent on the point that after Green stated that he wished the defendant to be arrested, Alpers advised the defendant that he was under arrest, and he read him his Miranda rights. Alpers searched the defendant and found $800. Padula testified that when he saw that each of the bills found in the defendant's pocket was marked in the fashion that Gender had previously described to him, he (Padula) ordered Alpers to place the defendant under arrest and to read him his Miranda rights.

As the defendant was about to be escorted from the office and the store, he indicated that he would like his coat which was in his office. Gender contacted an assistant store manager and asked him to get the defendant's coat. When the assistant store manager brought the coat to the security office, Padula took it and searched the pockets. He found a large white envelope which he opened. The envelope contained two certified checks, both payable to the defendant, in a total amount of $16,000.

The judge's finding that the citizens had knowledge of facts constituting probable cause to believe that the defendant had taken money from Osco is supported by the recited evidence. "These facts and circumstances amply warranted the police in concluding that it was 'more probable than not' that the defendant had committed the offense." *Commonwealth* v. *Cruz*, 373 Mass. 676, 685 (1977), quoting *Commonwealth* v. *Haas*, 373 Mass. 545, 567-568 (1977) (Hennessey, C.J., dissenting in part). See *Commonwealth* v. *Storey*, 378 Mass. 312, 321-322 (1979).

In Massachusetts "[a] private person may lawfully arrest one who in fact has committed a felony." *Commonwealth* v. *Lussier*, 333 Mass. 83, 92 (1955). As noted in *Commonwealth* v. *Harris*, 11 Mass. App. Ct. 165, 170 (1981), "Generally, the person arrested must be convicted of a felony before the 'in fact committed' element is satisfied and the arrest validated. If the citizen is in error in making the arrest, he may be liable in tort for false arrest or false im-

prisonment." It was also noted that "[a]s a practical matter, the 'in fact committed' requirement cannot be met when the propriety of a citizen's arrest is questioned on a motion to suppress because there has been no validating conviction." *Id.* At the hearing on the motion to suppress the Commonwealth introduced evidence to show that the defendant had in fact committed the felony with which he was charged;[3] the judge construed the phrase "in fact committed" as meaning that the citizens had to have had actual knowledge of the defendant's felonious act at the time of his arrest. At the conclusion of the hearing, the judge made an oral finding that the citizens had acted on the basis of probable cause rather than actual knowledge; he concluded that the arrest and search were illegal and he allowed the motion to suppress.

In urging us to uphold the citizen's arrest, the Commonwealth argues that when such an arrest is questioned at a pretrial stage of the criminal proceedings, probable cause is the applicable standard. In the alternative, it contends that it sufficiently demonstrated that the defendant had in fact committed a felony. (See note 2, *supra.*) See generally, *Commonwealth* v. *Harris*, 11 Mass. App. Ct. at 170 n.5, and cases therein cited. It is unnecessary for us to consider these issues, because the judge found, upon the Commonwealth's motion for reconsideration of the order allowing the motion to suppress, that the police made or

---

[3] The amended complaint against the defendant alleges that "on divers dates between July 10, 1980 and December 12, 1980," he stole over $100 from Osco. In addition to the previously summarized testimony, the Commonwealth introduced evidence to show that during the period covered by the complaint, unauthorized voids in the amount of $51,755 were entered on the manager's register terminal, that the defendant deposited large amounts of money in his bank account during that period, and that the two certified checks taken from the defendant's coat at the time of his arrest were drawn on that account. The Commonwealth also introduced in evidence the sworn statements of all the Osco employees, other than the defendant, who had access to the manager's register terminal during the five-month period of the thefts. These statements are to the effect that these employees had not used the manager's register terminal to enter void transactions.

directed the defendant's arrest. There is no basis for disturbing this finding, and the key question becomes whether the conduct of the police was such as to violate the Fourth Amendment to the United States Constitution and to require suppression of the checks and the money. "If, then, the exclusionary rule is properly applicable to the evidence taken from the [defendant], it must be upon the basis that some type of unconstitutional police conduct occurred." *Coolidge* v. *New Hampshire*, 403 U.S. 443, 488 (1971). *Commonwealth* v. *Storella*, 6 Mass. App. Ct. 310, 314 (1978). Cf. *Commonwealth* v. *Mahnke*, 368 Mass. 662, 677 (1975).[4]

In concluding that the arrest and the search of the defendant were illegal, the judge found that the police had promoted the defendant's arrest without having probable cause to do so. No subsidiary findings in support of this ultimate finding were made. The defendant argues that it rests upon the testimony of Gender and Alpers showing that even if Gender and Green had knowledge of facts and circumstances constituting probable cause, they did not communicate that information to the police.[5] However, the defendant overlooks Sergeant Padula's testimony which consistently expands that given by Gender and Alpers. Padula related that Gender told him about "cash register receipts and refunds and shortages in the money room on a daily basis," that Gender provided him with the "bookkeeping or accounting" information but it was "a little over my head," and that Gender described the markings that had been made on the money in the safe. At the conclusion of

---

[4] Even if the judge's finding that the police arrested the defendant is erroneous, we would conclude that the defendant's arrest was "technically a citizen's arrest, made by the police officers," and the controlling issue would remain whether "the police had probable cause to believe that a felony had been committed and that the person arrested had committed it." *Commonwealth* v. *Harris*, 11 Mass. App. Ct. at 171-172.

[5] Gender stated that when the police arrived, he "abreasted them of the situation as it prevailed" and that he "informed them of what had transpired and what we, Osco Drug, had reasons to believe — a felony was committed." Alpers testified that Gender "explained the situation to us."

the hearing on the motion to suppress, the judge considered aloud the Commonwealth's evidence, and we find nothing in his statements to indicate a disbelief or rejection of Padula's testimony.[6] If the judge's finding is based upon a subsidiary determination that Gender did not sufficiently relate his information to the police, it is clearly erroneous.

The evidence shows that Gender explained the sophisticated and technical method of the larceny to the police who were admittedly unable to comprehend it. On the other hand, if the judge's finding that the police lacked probable cause was based on the officers' inability to recognize that the register terminal's data showed probable cause, we conclude that the judge was in error. The record shows that Padula's doubt as to the existence of probable cause was not because he lacked faith or belief in the reliability or credibility of the citizens, nor was the doubt due to a faulty assessment of facts ascertainable from common knowledge and experience. See generally 1 LaFave, Search and Seizure, A Treatise on the Fourth Amendment § 3.2(b) (1982 pocket supplement). Rather, Padula's concern was the result of his erroneous determination of the legal significance of intricate but highly probative information which

---

[6] As we try to follow the judge's train of thought, we see two statements which are relevant to this question: (1) "We are also in agreement that the police officer, when he was summoned, after having been given all of the pertinent facts on the ongoing investigation — and that's all you can call it — felt that in his mind (not that it was binding upon the Court) that he did not have reason to arrest;" (2) "You mean to tell me that an ordinary . . . forget a police officer . . . any ordinary, intelligent person says that we have had a terminal which has been isolated under observation, and the only person who had access to that terminal was so-and-so, and while I was watching it, I saw two voids totaling $800 check in; I immediately picked up the phone, called that terminal, and so-and-so answered. You mean to tell me the police officer wouldn't be able to understand that type of dialogue?" The prosecutor responded, "I find it hard to believe that that is true. But the officer . . . you know, we have to stand by what the officer said." The judge replied, "And I have to go on facts that I hear." We would point out that the judge's description of the accounting procedure is a simplified summary of over 360 pages of transcript and register tapes introduced in evidence.

called for immediate action. The distinction is major because courts are not concerned with an officer's subjective judgment in the latter situation. See *United States* v. *Day*, 455 F.2d 454, 456 (3d Cir. 1972) ("[W]e would not consider ourselves bound by a police officer's inability to articulate his conclusions if the facts clearly demonstrated the existence of probable cause"); *United States ex rel. Senk* v. *Brierley*, 381 F.Supp. 447, 463 (M.D. Pa. 1974) ("[S]ince the courts have never hesitated to overrule an officer's determination of probable cause when none exists, consistency suggests that a court may also find probable cause in spite of an officer's judgment that none exists"). Cf. *United States* v. *McCambridge*, 551 F.2d 865, 870 (1st Cir. 1977) ("[T]he validity of an arrest is normally gauged by an objective standard rather than by inquiry into the officer's presumed motives"); *Commonwealth* v. *Avery*, 365 Mass. 59, 65 (1974).

We conclude that there is no support in the record for the judge's ultimate finding that the police made or directed the defendant's arrest without probable cause. Because the judge correctly found that the citizens had information constituting probable cause and because the evidence shows that that information was related to the police, it follows that the police had probable cause to arrest the defendant. We see no police misconduct which requires the exclusion of the money or the checks taken from the defendant. See G. L. c. 276, § 1, as amended by St. 1974, c. 508. Contrast *Commonwealth* v. *Pigaga*, 12 Mass. App. Ct. 960 (1981).

The order allowing the motion to suppress is reversed, and the matter is remanded to the District Court for further proceedings.

*So ordered.*