## Commonwealth *vs.* Erik Aarhus.

Middlesex. September 15, 1982. — December 17, 1982.

Present: Wilkins, Liacos, Abrams, Nolan, & Lynch, JJ.

*Homicide. Constitutional Law,* Search and seizure, Admissions and confessions, Waiver of constitutional rights. *Waiver. Search and Seizure,* Military reservation. *Probable Cause.*

Where military officials had probable cause to believe that a murder weapon was concealed in a certain barracks room on a United States military reservation and that the soldier who occupied the room was directly implicated in the murder of another soldier, they had a legitimate interest in searching the room under military procedures and seizing a knife found therein, and, in doing so, they were not acting "as a mere instrumentality of the local municipal police." [740-741]

On a motion to suppress a knife from evidence at the murder trial of a soldier, the evidence warranted the judge's finding that a search of the defendant's barracks room on a United States military reservation, by military officials, had received the prior approval of the reservation's commanding officer in accordance with established military law and regulations. [741-743]

Information presented to the commanding officer of a United States military reservation to establish probable cause for the search of a certain barracks room on the reservation and the seizure of a knife therein was sufficient to satisfy the requirements of military law and regulations and to fulfil the two-pronged test of *Aguilar* v. *Texas,* 378 U.S. 108, 114 (1964). [743-745]

In the circumstances, an incorrect statement by a State police officer to an arrested serviceman to the effect that a military investigator was "here to see that your rights are protected," followed by a second recitation of his Miranda rights, did not mislead the serviceman as to the substance of his rights or otherwise vitiate his waiver of them. [745-747]

Indictment found and returned in the Superior Court Department on May 15, 1979.

A pretrial motion to suppress evidence was heard by *Morse,* J., and the case was tried before *Young,* J.

*William J. Kittredge* for the defendant.

*Susan C. Mormino,* Assistant District Attorney, for the Commonwealth.

LYNCH, J.  Erik Aarhus was convicted of murder in the first degree of Elaine Tyree and was sentenced to life imprisonment.  He appeals from his conviction, alleging errors of law in the admission at his trial of physical evidence seized from his barracks room and statements he made to the police following his arrest.  In addition, he seeks review pursuant to G. L. c. 278, § 33E.  We find no error or any reason for the exercise of our plenary powers under § 33E.  We affirm the judgment of conviction.

On August 13, 1979, the defendant filed a motion to suppress the statements he made on February 13, 1979.  This motion was denied on December 10, 1979.  On January 16, 1980, the trial attorney who was appointed after the defendant's first attorney had withdrawn, moved to revoke the order denying the original motion to suppress evidence.  After a hearing, the motion was again denied.  Trial began on January 29, 1980.  On February 7, 1980, the jury returned a verdict of guilty of murder in the first degree.

The primary evidence implicating the defendant in this murder is not in dispute, as it primarily arose from his confession.  Since the defendant has raised a number of objections about the process by which the police obtained the evidence, we shall review the sequence of events resulting in the defendant's arrest and confession.  The following facts appear from the findings of both the trial judge and the motion judge.[1]

On January 30, 1979, Elaine Tyree, a servicewoman in the United States Army stationed at Fort Devens, in Ayer, Massachusetts, was found dead in her apartment.  She had been stabbed repeatedly and her throat had been cut. Police suspicion quickly focused on her husband, William Tyree,

---

[1] Both the judge who heard the original motion to suppress and the trial judge who heard the motion to revoke the order denying the motion to suppress made written findings.

Jr., also a member of the United States Army stationed at Fort Devens.[2]  Tyree was acquainted with the defendant, who, like the Tyrees, was an enlisted member of the Army assigned to Fort Devens.  In early January, 1979, both Tyree and Aarhus had been subjected to nonjudicial disciplinary proceeding by their military superiors (referred to as an "article 15" by the military, see art. 15, 10 U.S.C. § 815 [1976]) because of their alleged involvement in a theft of government property.

During questioning by the Ayer police, the State police, and the Army's Criminal Investigation Division (CID), Tyree attempted to shift the focus of the murder investigation to Aarhus.  During an interview at the Ayer police station on Monday, February 12, 1979, Tyree stated that he had arranged a meeting with Aarhus at the Tyrees' apartment on Monday, January 29, 1979, the night before the murder, to discuss their art. 15 disciplinary proceedings.  However, Tyree claimed that he had changed his mind and told Aarhus not to come over.  Nevertheless, Aarhus went to the Tyrees' apartment on that Monday night.  Tyree suggested that Aarhus's behavior made him a likely suspect for the murder.  Tyree told the officers, "I think it was Aarhus.  I can't explain why he was at my house the night before it happened."

On February 13, 1979, or the previous evening,[3] Tyree informed Chief William Adamson of the Ayer police department that Aarhus had admitted the murder to him.  Tyree stated that he could obtain from Aarhus the knife used in the murder.  Tyree arranged for the police to be present at a rendezvous he had made with Aarhus at which Aarhus would deliver the murder weapon to him.  Early on the afternoon of February 13, 1979, the police "staked out"

---

[2] Tyree was subsequently convicted of murder in the first degree of Elaine Tyree.  This court affirmed his conviction.  *Commonwealth* v. *Tyree, ante* 191 (1982).

[3] During Tyree's trial, there was evidence that he called the Ayer police with this information on the evening of February 12, 1979.

the area designated by Tyree. However, when Tyree appeared, he informed the police that Aarhus could not then leave the post.

Later that afternoon, Adamson and Lieutenant John Dwyer of the State police were at CID headquarters on Fort Devens discussing the case with Special Agent Joseph Burzynski, one of two CID agents actively involved in the murder investigation. Tyree suddenly appeared and announced that he had just come from Aarhus's barracks. He informed the officers that he had been in Aarhus's room and that he had seen the knife used to murder his wife under Aarhus's pillow. Tyree claimed that previously he had arranged with Aarhus to buy the weapon for $5,000. If the authorities did not move promptly, Tyree asserted, Aarhus would remove the knife from Fort Devens.

Agent Burzynski immediately telephoned Special Agent Paul Mason, the CID agent in charge of the military investigation of Elaine Tyree's murder. Agent Mason, accompanied by Agent Collins, the CID operations officer, hastened to CID headquarters. Having done this, Agent Burzynski began questioning Tyree about his allegations. Burzynski knew both Tyree and Aarhus since he had been involved in the earlier investigation concerning their alleged theft of government property. Tyree suggested that Aarhus had a motive arising out of his earlier investigation for killing Elaine Tyree. Tyree claimed that Aarhus had threatened to change his earlier statements to the CID agents regarding Tyree's complicity in the theft in order to implicate Tyree further. To prevent this, Tyree stated, he agreed to pay Aarhus for his silence. Tyree declared that he had informed his wife of Aarhus's threats and that on January 29, 1979, she had advised Aarhus that she intended to reveal his conduct to the CID. Tyree alleged that Aarhus killed Elaine Tyree to prevent these revelations.

Tyree's allegations convinced Burzynski that probable cause existed to search Aarhus's quarters. Burzynski left Tyree in the conference room and then, in accordance with military procedure, see Manual for Courts-Martial, United

States par. 152 (rev. ed. 1969), called Colonel Rittgers, the commanding officer of Fort Devens, to obtain authorization to conduct the search. Burzynski related the details of Tyree's statement to Rittgers. Rittgers carefully examined the grounds for the search with Burzynski. After he was convinced fully that Burzynski had presented adequate grounds for a determination of probable cause, Rittgers gave his oral authorization for the search. Immediately after Rittgers gave permission to search Aarhus's room, Adamson, Dwyer, CID Agents Mason and Jackson, and Trooper Patrick Keane departed for Aarhus's barracks. On their arrival, Mason introduced the civilian authorities to Captain Polcrack, Aarhus's company commander, who had been notified of the impending search. Captain Polcrack led them to Aarhus's room and directed the "charge of quarters" to open the door. Mason entered the room, went to Aarhus's bed, removed his pillow, and discovered a knife and sheath wrapped in two plastic bags. The knife was covered with bloodstains which were later determined to be of Elaine Tyree's blood type.

After finding the knife, Mason detailed Jackson to the barracks where Aarhus was working in order to "secure" him. Burzynski arrived shortly thereafter and placed Aarhus "under apprehension." Aarhus was then transported back to CID headquarters for questioning.

Adamson, Dwyer, and Burzynski conducted the interrogation of Aarhus at the CID headquarters. Adamson informed the defendant that they were investigating the murder of Elaine Tyree and then explained to the defendant his Miranda rights. At the same time, Burzynski informed the defendant of his rights under the military code, including his right to a military lawyer, if he so chose. The defendant refused the offer of a military lawyer, stated that he understood his rights, repeated them for Chief Adamson, and agreed to be interviewed.

Dwyer then suggested that they tape record the interrogation. On the recording Adamson identified the officials present in the interrogation room. In referring to Burzynski,

Adamson inaccurately told Aarhus, "He's here to see that your rights are protected." Adamson then repeated the substance of the Miranda warnings. He also told Aarhus that Aarhus could stop the interrogation at any time he wanted. Adamson further elicited an admission from Aarhus that he had previously given Aarhus his Miranda rights. The defendant again acknowledged that he understood his rights and the questioning began anew.

The interrogation continued for approximately two hours. Initially, the defendant denied involvement in the murder. He attempted to explain away the presence of the incriminating knife under his pillow. The defendant admitted that the knife was his but claimed that he had lent the knife to William Tyree around January 27, 1979. Tyree returned the knife, according to Aarhus, on the Saturday following the murder. The police noted that this was not possible as Tyree was then in Maryland at his wife's funeral. The police pointed out this inconsistency in the defendant's story and expressed their disbelief in his denial of culpability.

After being caught in this lie, Aarhus confessed his involvement in the murder. He admitted that Tyree had offered him $5,000 to "extinguish" Elaine Tyree. Tyree was to pay the defendant with part of the insurance money he hoped to collect from his wife's death. On the morning of the murder, Tyree drove Aarhus to the Tyree apartment and left the defendant inside the apartment. In accordance with their plan, Tyree later drove his wife to the apartment and sounded the car's horn twice to signal Aarhus that she was coming. When Mrs. Tyree entered the apartment, Aarhus stabbed and killed her.

1. *The search of the barracks room.* The defendant has made several arguments against the legality of the search. We shall review each of his arguments separately.

a. The defendant first contends that the motion to suppress should have been granted on the ground that the military personnel, in conducting the search, were acting "as a mere instrumentality of the local municipal police." The defendant alleges that the local police used the military

authorities to conduct the search in order to take advantage of the less stringent requirements which must be met prior to the authorization of a military search.[4]  On the facts presented in this case, however, the defendant's claim of pretext is unconvincing.  While it is true that the civilian police sought aid from the military authorities, it is clear that assistance of military officials was required for aspects of the investigation linked to Fort Devens.  Moreover, the military officials were operating within their proper sphere.  As the trial judge found in denying the defendant's motion to revoke the order denying the motion to suppress, "[a]t the time of the search, the CID agents had probable cause to believe that a murder weapon was located at the Service Company barracks on Fort Devens and that a soldier in the United States Army was directly implicated, if not guilty of the murder of another soldier."  Such conduct clearly constitutes an offense against the good order and discipline of the military forces.  The Uniform Code of Military Justice specifically proscribes murder.  See 10 U.S.C. § 918 (1976).  Thus, the CID agents had sufficient grounds for pursuing their own investigation.  The victim and the suspect were both Army personnel.  The search, as the judge found, occurred on a military reservation.  These factors clearly demonstrate that the military had a legitimate, independent interest in conducting the search of the defendant's barracks.  Thus, the participation of the military officials provides no ground for invalidating this search.

b.  The defendant next challenges the procedure followed by the military officials in making the search.  Specifically, he argues that the CID agents violated proper military procedure by failing to obtain the post commander's authorization for the search prior to entering Aarhus's room and seizing the murder weapon.

---

[4] As will be discussed further below, probable cause for a military search, unlike a civilian search, may be established from unsworn, oral statements.  Also military searches may be authorized orally by the commanding officer.  See Manual for Courts-Martial, United States par. 152 (rev. ed 1969).

It is undisputed that the search at issue here took place upon a military reservation subject to the applicable military law. Under relevant military law, since "[t]he commanding officer [has] jurisdiction over the place where the property is situated . . . [he] may authorize a search of such property." Army Reg. 190-22, par. 2-1, 32 C.F.R. § 552.18(f)(1) (1979). See Manual for Courts-Martial, United States par. 152 (rev. ed. 1969); J. Munster & M. Larkin, Military Evidence § 9.1, at 427-432 (2d ed. 1978). This military procedure which permits searches to be authorized by the commanding officer following an oral, unsworn presentation of probable cause and permits searches to be executed without a written warrant has been held not to violate the Fourth Amendment to the United States Constitution. See *Wallis* v. *O'Kier,* 491 F.2d 1323, 1325 (10th Cir.), cert. denied, 419 U.S. 901 (1974); *United States* v. *Grisby,* 335 F.2d 652, 656 (4th Cir. 1964).

The CID agents conducted the search pursuant to this well established military law. Burzynski applied for authorization for the search from Rittgers, post commander at Fort Devens. The defendant does not dispute Rittgers' authority to permit the search but only claims that the CID agents began the search prior to the time that Rittgers gave his formal approval.

The defendant's challenge is directed essentially at the trial judge's finding of fact. While the trial judge recognized some ambiguity in the precise times assigned to their acts by the individuals involved, he specifically found that Rittgers gave his oral authorization for the search to Burzynski before either the military or the civilian authorities had left the CID headquarters to conduct the search at the barracks. The evidence presented at the hearing clearly supports this finding. Thus, the defendant's argument founders on the well established principle of appellate review that subsidiary findings of fact made by the judge below will be accepted by this court absent clear error. See *Commonwealth* v. *Jackson,* 377 Mass. 319, 325 (1979); *Commonwealth* v. *White,* 374 Mass. 132, 137 (1977), aff'd,

439 U.S. 280 (1978); *Commonwealth* v. *Hosey*, 368 Mass. 571, 574 n.1 (1975). We find no such error.

c. Finally, the defendant argues that the evidence seized from his barracks should have been suppressed on the ground that the search lacked probable cause. Specifically, the defendant disputes the validity of the probable cause determination made by Rittgers. He asserts that Burzynski did not provide Rittgers with sufficient information to substantiate the reliability of the informant, Tyree, and, further, that Burzynski failed to explain to Rittgers the basis for Tyree's conclusion that the murder weapon was present in Aarhus's barracks.

The military procedure required for the commanding officer to determine probable cause based on an informant's report parallels the constitutional requirements specified by the United States Supreme Court for determining such probable cause. *Aguilar* v. *Texas*, 378 U.S. 108, 114 (1964). Manual for Courts-Martial, United States par. 152 (rev. ed. 1969), states: "Probable cause for ordering a search exists when there is reason to believe that items . . . are located in the place or on the person to be searched. Such a reasonable belief may be based on information which the authority requesting permission to search has received from another if the authority ordering the search has been apprised of some of the underlying circumstances from which the informant concluded that the items in question were where he claimed they were and some of the underlying circumstances from which the authority requesting permission to search concluded that the informant, whose identity need not be disclosed, were credible or his information reliable." This standard follows precisely the two-pronged test formulated by the Supreme Court for establishing probable cause based on an informant's statement. *Aguilar* v. *Texas, supra.*

In this case, therefore, Agent Burzynski presented Colonel Rittgers with information that satisfied both the military standard set forth in par. 152 and, by necessary implication, the *Aguilar* standard. The trial judge found specifically that the search was justified by the probable

cause standard applicable to civilian courts. The first prong of the *Aguilar* test, the basis of Tyree's knowledge, was amply satisfied. Tyree told Agent Burzynski that Aarhus had confessed his culpability in Elaine Tyree's murder to Tyree, that Tyree had arranged to purchase the murder weapon from Aarhus, and that Tyree had just left Aarhus's barracks where he had seen the knife hidden under Aarhus's pillow. These allegations clearly constitute underlying facts on which the informant Tyree based his information that the evidence was where he claimed it was. See *Commonwealth* v. *Stevens*, 362 Mass. 24, 27 (1972), and cases cited. Burzynski related this information to Rittgers during their telephone conversation prior to the search. Thus, Rittgers had sufficient information for concluding that this portion of the informant's credibility test under *Aguilar* had been met. See *Commonwealth* v. *Weiss*, 370 Mass. 416, 419 (1976), and cases cited.

The second prong of the *Aguilar* test requires that the magistrate be informed of some of the underlying circumstances from which the reporting officer concluded that the informant is credible or his information reliable. This "veracity" prong is also adequately satisfied in this case. Here (unlike the usual unnamed informant situation) Tyree's statement had an ostensible patina of credibility. As the victim's husband, Tyree presumably had a strong desire to see his wife's murderer brought to justice. See *Commonwealth* v. *Bowden*, 379 Mass. 472, 477 (1980). See also *Nelson* v. *Moore*, 470 F.2d 1192, 1197 (1st Cir. 1972), cert. denied, 412 U.S. 951 (1973) (asserted victim of crime is considered reliable informant even though his reliability has not previously been proved or tested). Moreover, the precise description of the location of the knife from an informant known to the authorities tended to demonstrate the reliability of his information. See *United States* v. *Bigos*, 459 F.2d 639, 641-642 (1st Cir. 1972); *Commonwealth* v. *Fleurant*, 2 Mass. App. Ct. 250, 253 (1974). Rittgers, as the Tyrees' commanding officer, was acquainted with the circumstances of the crime. In addition, he asked Burzynski

whether Tyree had made any inconsistent statements or whether Burzynski had any ground to doubt the veracity of the statement. There is no basis for disturbing the judge's finding that Rittgers made a proper, independent decision that probable cause existed for the search of the defendant's barracks room. *Commonwealth* v. *Bowden, supra* at 477-478. *Commonwealth* v. *Jackson,* 377 Mass. 319, 325 (1979).

2. *Admission of the defendant's statement.* The defendant next argues that his statement made to the police after his arrest should be suppressed because the police misled him as to the substance of his Miranda rights. *Miranda* v. *Arizona,* 384 U.S. 436 (1966). The defendant points to the ambiguous statement made to him by Adamson at the beginning of the recorded portion of the interrogation in which Adamson, in referring to the presence in the room of CID Agent Burzynski, stated, "He's here to see that your rights are protected." The defendant now claims that this reference confused him and vitiated his consent to be interrogated.

This contention, however, is belied by the findings of both the motion judge and the trial judge. Both judges, after listening to the recordings of the interrogation by the civilian and military authorities and reviewing the evidence offered by the parties, concluded that the defendant had knowingly, willingly, voluntarily, and intelligently waived his Miranda rights. This ruling is entitled to substantial deference on appeal. *Commonwealth* v. *White,* 374 Mass. 132, 137-138 (1977). However, "where the ultimate findings and rulings bear on issues of constitutional dimension, they are open for review." *Commonwealth* v. *Haas,* 373 Mass. 545, 550 (1977). The voluntariness of the defendant's waiver is tested by examining the totality of the circumstances. *Commonwealth* v. *Hooks,* 375 Mass. 284, 289 (1978). *Commonwealth* v. *Borodine,* 371 Mass. 1, 6 (1976), cert. denied, 429 U.S. 1049 (1977). Our independent determination of the correctness of the judge's application of constitutional principles to the facts found reveals no error and

our review of the record does not show any confusion on the defendant's part about his rights.

The record demonstrates that the police had advised the defendant of his rights prior to the beginning of the recording and that the defendant had already acknowledged that he understood his rights and that he was willing to talk to the police. The effective waiver by the defendant of his Miranda rights was not tainted by any misconceptions concerning Burzynski's purpose in being present in the room during the interrogation. While the statement made by Chief Adamson about Burzynski was confusing, it was made prior to the second recitation of the defendant's full Miranda rights. The reference to Burzynski's presence was clearly distinguished from the defendant's right to an attorney. The defendant's right to an attorney was stated twice and he could not reasonably have been confused by this vague reference to Burzynski protecting his rights. Also, prior to the recorded portion of the interrogation, during Adamson's initial explanation of the defendant's Miranda rights, Burzynski had interjected that the defendant had a right to a military attorney. Burzynski asked the defendant whether he wished to take advantage of this additional right provided by the military and the defendant declined. This fully distinguished Burzynski's role at the interrogation. In addition, the defendant had previous experience with CID agents and knew that he was now a suspect in a murder investigation. In these circumstances, the trial judge's and motion judge's independent conclusions that the defendant was not misled are well supported by the evidence.

After listening to the recording of Aarhus's confession, reviewing the transcript of the original motion to suppress, and taking the testimony of the witnesses at the motion to reconsider, the trial judge found independently but consistently with the motion judge that looking to the totality of the circumstances the Commonwealth had met its heavy burden of establishing the voluntariness of Aarhus's confession and the knowing, intelligent, and voluntary waiver by Aarhus of his Miranda rights. See *Commonwealth* v. *Mee-*

*han,* 377 Mass. 552, 563 (1979), cert. dismissed, 445 U.S. 39 (1980); *Commonwealth* v. *Murray,* 359 Mass. 541, 546 (1971). See also *Miranda* v. *Arizona, supra* at 475. The defendant clearly stated that he was willing to talk to the police and this adequately evidences a waiver of those rights. See *Commonwealth* v. *Williams,* 378 Mass. 217, 225-226 (1979); *Commonwealth* v. *Borodine,* 371 Mass. 1, 6 (1976), cert. denied, 429 U.S. 1049 (1977). Explicit statements by the defendant that he understood his rights and waived them are not essential to a finding of a valid waiver. See *North Carolina* v. *Butler,* 441 U.S. 369 (1979); *Commonwealth* v. *Santo,* 375 Mass. 299-303 (1978); *Commonwealth* v. *Valliere,* 366 Mass. 479, 487 (1974). We perceive no error in the rulings of either the motion judge or the trial judge and, accordingly, we decline to disturb their actions.

3. *Review pursuant to G. L. c. 278, § 33E.* We have examined the record in this case and have concluded that no basis exists on which to order a new trial or to direct the entry of a verdict of a lesser degree of guilt. The jury verdict returned in this case was fully "consonant with justice." *Commonwealth* v. *Baker,* 346 Mass. 107, 109 (1963).

*Judgment affirmed.*