Robert S. TOMCZAK

v.

The TOWN OF BARNSTABLE, et al.

Civ. A. No. 94–10441–RGS.

United States District Court,
D. Massachusetts.

Aug. 4, 1995.

Robert S. Tomczak, Sharon, CT, Pro Se.

Daniel K. Danielson, Kirby & Associates, Boston, MA, Michael J. Keefe, Johnson, O'Malley & Harvey, Boston, MA, John J. O'Brien, Jr., Kirby, O'Brien & von Rosenvinge, Boston, MA, for Defendants.

## *MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

STEARNS, District Judge.

Robert Tomczak, acting pro se, brought this Complaint against four Barnstable Police officers: Robert Murphy, Mark Frenzo, Manuel Jason, and Reid Hall; the Barnstable Police Department; and the Town of Barnstable, alleging civil rights violations under 42 U.S.C. § 1983 and defamation. Tomczak claims that the defendants detained and arrested him without cause, subjected him to an unduly suggestive identification, and failed to properly investigate his alibi. Tomczak was ultimately found not guilty in a state court trial. Before the court is defendants' motion for summary judgment on all counts of the Complaint.[1]

---

1. Sgt. Robert Murphy booked Tomczak upon his arrest. At the hearing on the motion for summary judgment, Tomczak conceded that he has no evidence to show that Sgt. Murphy was involved in any of the alleged violations. As such,

## FACTS

The facts, viewed in the light most favorable to Tomczak as the nonmoving party, are these. On March 24, 1991, Jessica Pisacano and Abby Burke, both age nine, left Pisacano's father's home on Long Beach Road in Centerville, Massachusetts,[2] to walk to a candy store. The children set out in the direction of the Centerville Bridge near Craigville Beach. Around 11:00 a.m. the girls came running back to the house visibly distressed. They told Margo Wharton[3] "that a man in a green car was chasing us. He tried to make us get in the car." The girls described the man as white, with pale skin, a moustache, and black "greasy hair." The girls said that he was three inches shorter than Jessica's father who is six feet two inches tall. The man was wearing light clothes, a dark hat, and a dark cape-like coat. He was driving an old but shiny medium dark green car that had non-Massachusetts license plates that were red, white, and blue. The word "D–LUX" was printed on the plate. The girls also said that the license plates "had a picture in the middle."

Wharton called the police and Officer Mark Frenzo responded. Frenzo spoke with the children in Wharton's presence. The girls confirmed the descriptions of the car and the suspect. The girls said that the man had told them to get in his car and that when they refused he "started walking real fast towards them and they ran away from him."[4] At 11:30 a.m., Officer Frenzo left the Pisacano house and broadcast the descriptions on his car radio to other Barnstable police officers.

At 11:50 a.m., Officer Frenzo encountered a 1952 dark green Chevrolet exiting a church parking lot. The car bore a red, white, and blue Maine license plate with a picture of a lobster in the middle. The plate read "D–LUX." Tomczak was driving. He wore a moustache. He had white skin and dark hair. He was wearing a white and tan striped shirt.

Officer Frenzo signalled Tomczak to stop. He did. Shortly thereafter, Sgt. Manuel Jason and a third officer, Patrolman Chase, arrived at the scene in separate cruisers. Officer Frenzo and Sgt. Jason read Tomczak his Miranda rights. Tomczak stated that he understood them. Officer Frenzo then related the girls' allegations. Tomczak admitted that he had been in the vicinity of the bridge at Craigville Beach at approximately 11:00 a.m. that day.[5] Tomczak was then questioned about where he lived, why he was on the Cape, what he had been doing in the area, and whether he possessed any weapons. While being questioned, Tomczak felt that he was not free to leave or to refuse to answer questions because all three officers were wearing guns and their cruisers' lights were activated.

Officer Chase then left the scene. Officer Frenzo and Sgt. Jason decided that Frenzo would ask Tomczak if he would accompany them to the police station. Tomczak agreed.[6]

---

summary judgment in Sgt. Murphy's favor will be granted.

2. Centerville is a political subdivision of the Town of Barnstable.

3. Ms. Wharton testified in Tomczak's criminal trial that she is Mr. Pisacano's girlfriend and lives at his house.

4. Officer Frenzo has submitted an affidavit stating that he believed the girls' account.

5. Tomczak states that he was mistaken about his whereabouts because he was nervous about being stopped and questioned. Tomczak does not, however, deny telling Officer Frenzo that he had been in the vicinity of the bridge.

6. Tomczak argues that "[b]oth officers patrolman Mark Frenzo and Sgt. Manuel Jason ordered [him] ... to proceed to the Barnstable Police Department Headquarters for further interrogation." Tomczak, however, has not presented facts disputing Frenzo's version of events. While Tomczak cites Officer Frenzo's police report, it explicitly states that Frenzo told Tomczak that he was not being charged with a crime and that Tomczak had agreed to go to the police station after "we asked (Sgt. Jason and myself) if he [Tomczak] could come into the B.P.D. for questioning. [Tomczak] said 'yes' and drove into the B.P.D...." Plaintiff's Memorandum, Tab 15. Tomczak asserts that there is evidence that Sgt. Jason forced him to go to the station. Tomczak quotes Sgt. Jason's testimony that he told Frenzo "Okay, take him [Tomczak]." Sgt. Jason's full statement, however, was that Frenzo came back to him after speaking with Tomczak and "said that the operator would be willing to go to the police facility. I said, 'Okay, take him.'" Plaintiff's Memorandum, Tab 16, p. 15.

Tomczak drove to the station in his own car bracketed by the police cruisers.

At about the same time, Jessica Pisacano's father and Ms. Wharton decided to drive the girls to the candy store. En route, they saw Tomczak being escorted to the police station. They followed. No one in the police department had asked them to come to the station.

At the station, Tomczak was brought through an electronically locked door to an interrogation room. He was readvised of his Miranda rights. Officer Frenzo told Tomczak that he was not being charged with a crime and that he was free to leave.[7] He stayed. Several police officers questioned him. At some point, the girls were asked to look through a window and verify that Tomczak was the man who had chased after them. They did. The children also identified Tomczak's car in the police lot. At the subsequent criminal trial, the identifications were suppressed. On November 19, 1991, Tomczak was found not guilty of attempted kidnapping.

At the station, Tomczak consented to a search of his car. No evidence was seized. Tomczak states that he was at the station in a "locked area in excess of one hour while the police confirmed the information, searched his vehicle and supervised an unlawful identification.... Eventually, [he] was allowed to leave." Plaintiff's Memorandum, p. 12.

On March 25, 1991, Tomczak called the station and spoke with a Lt. Hoxie. Tomczak then met with Lt. Hoxie and told him that he could account for his whereabouts at the time of the alleged incident.[8] Lt. Hoxie told him this was premature because the paperwork had not yet been completed and the investigating officer was not available. "It was left that Lt. Hoxie would get in touch with plaintiff." Plaintiff's Memorandum, at 13. He did not.[9]

On March 27, 1991, the Juvenile Officer, Det. Reid Hall, returned to work. He read Frenzo's report and, the following day, interviewed the children. The children told Det. Hall the same story that they had told Officer Frenzo. Det. Hall prepared a report describing the children's allegations. Tomczak does not dispute that Det. Hall accurately reported what the girls said.[10] Det. Hall then sought a criminal complaint from an Assistant Clerk Magistrate of the Barnstable District Court. Tomczak does not allege that Det. Hall knowingly or recklessly made false statements to the Magistrate.[11] Later that day, the Magistrate issued a complaint for attempted kidnapping and a warrant for Tomczak's arrest.

Tomczak was arrested on March 28. After being given Miranda warnings, he chose to make no further statements and indicated that he would consult with an attorney. Tomczak posted bail the following day. The arrest was entered into a police activity log. A brief report of the arrest was subsequently published in a local newspaper.

On April 18, 1991, Officer Laurie Savioli took a statement from Jessica Pisacano about

---

7. Tomczak asserts that he was not in fact free to go because he was being held in a locked room. Tomczak does not dispute that he was told that he could leave.

8. Tomczak admits that, at the time of the call to Lt. Hoxie, he did not know the name of anyone who might provide him with an alibi. Sometime after the call, he did learn the names of alibi witnesses. By that time, however, he was represented by counsel who had instructed him not to speak with the police. At no time prior to the trial did the police learn the names of any of Tomczak's alibi witnesses.

9. After Tomczak was formally arraigned on March 28, Lt. Hoxie could have only initiated contact with Tomczak through his counsel. See Patterson v. Illinois, 487 U.S. 285, 290 n. 3, 108 S.Ct. 2389, 2393 n. 3, 101 L.Ed.2d 261 (1988).

10. Det. Hall has submitted an affidavit stating that believed the children and found them to be sincere and serious.

11. Tomczak contends that the incident actually occurred closer to 10:30 a.m., rather than at 11:00 a.m. as Det. Hall indicated to the Magistrate. Tomczak faults Det. Hall for taking this fact at face value from Officer Frenzo's report. Ms. Wharton testified at the trial that the incident had occurred sometime before 11:00 a.m. when the police were called. A factual error in an affidavit that has no material bearing on probable cause does not raise Fourth Amendment concerns. See United States v. Monaco, 700 F.2d 577, 580 (10th Cir.1983); United States v. Baldwin, 691 F.2d 718, 720 n. 1 (5th Cir.1982).

an incident she said had occurred the previous day. Pisacano stated that the car involved in the March 24th incident had driven slowly past her house. The report was significant because Tomczak's car was in storage at the time. Tomczak's attorney was not immediately told of Pisacano's allegation.[12] At trial, in November, Tomczak called the manager of the storage facility where his car was housed to testify that the company's records indicated that Tomczak had not used his car at anytime during the month of April.

## DISCUSSION

Reading the Complaint generously, Tomczak alleges five separate violations of his constitutional rights. Tomczak first claims that he was seized in violation of the Fourth Amendment on March 24, 1991, when Officer Frenzo illegally stopped his car without probable cause and detained him for thirty minutes. Tomczak next contends that he was illegally compelled to go to the police station where he was held against his will, in further violation of his Fourth Amendment rights. While at the station, Tomczak claims that he was subjected to an unduly suggestive identification in violation of his right to due process. Tomczak's fourth claim is that Det. Hall procured an arrest warrant without first inquiring whether Tomczak had an alibi.[13] Finally, Tomczak alleges that Hall and Officer Savioli[14] failed to sufficiently investigate the second supposed sighting of his car by Jessica Pisacano. Had they done so, Tomczak alleges they would have discovered exculpatory evidence warranting dismissal of the charge.

■ Tomczak's initial Fourth Amendment claim fails because "based upon the whole picture," the police at a minimum had "a particularized and objective basis" for stopping Tomczak to investigate his possible involvement in a felony. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). See also *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Hensley*, 469 U.S. 221, 227, 105 S.Ct. 675, 679, 83 L.Ed.2d 604 (1985); *United States v. Kimball*, 25 F.3d 1, 6 (1st Cir.1994).

■ It is also clear that Officer Frenzo had probable cause to believe that Tomczak was the man whom the children had identified. Officer Frenzo personally verified the complaint by interviewing the girls. He assessed their story to be credible.[15] Frenzo found Tomczak's car less than an hour later in the vicinity of the alleged crime. Tomczak and his car matched perfectly the descriptions given by the girls. The descriptions consisted of more than vague generalities. They included three telling, immediately verifiable details: the tri-colored out-of-state "D–LUX" license plate bearing a pictorial emblem; the color and age of the car; and the suspect's black "greasy" hair, pale complexion, moustache, and light colored shirt.[16]

■ Not only did the girls' descriptions give Officer Frenzo "specific and articulable" facts justifying the stop of Tomczak's car, they gave him probable cause to arrest Tomczak. Probable cause requires more than suspicion, but much less than the evidence necessary for a conviction. *Henry v.*

---

**12.** Tomczak has submitted a letter from Charles Sabatt, the attorney who represented Tomczak prior to the criminal trial. He states that he was told of Jessica Pisacano's new allegation by Det. Hall on April 25, 1991, during a pretrial conference. Plaintiff's Memorandum, Tab 18, Exhibit 5. Tomczak makes much of the fact that he was not charged in connection with this second incident. It is not clear what he could have been charged with, or why that fact is relevant.

**13.** The constitutional violation alleged to flow from the failure to determine whether Tomczak had an alibi is unclear. I assume that Tomczak means to say a more diligent investigation would have led Hall to conclude that he lacked probable cause to seek a complaint.

**14.** Officer Savioli is not named as a defendant.

**15.** A reported victim of a crime "is a reliable informant even though ... her reliability has not theretofore been proven or tested." *Nelson v. Moore*, 470 F.2d 1192, 1194 (1st Cir.1972) (fourteen year old victim of assault and battery and statutory rape presumed reliable). See also *Commonwealth v. Aarhus*, 387 Mass. 735, 744, 443 N.E.2d 1274 (1982). This is so even if the victim is a child as young as six years old. *State v. Carver*, 51 Wash.App. 347, 753 P.2d 569, 571 (1988).

**16.** Once he was stopped, police were also able to verify that Tomczak was exactly 5′ 11″ in height.

*United States,* 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959). "In dealing with probable cause . . . as the very name implies, we deal with probabilities . . . on which reasonable and prudent men, who are not legal technicians, act." *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). "The standard of probable cause is the probability, not a *prima facia* showing, of criminal activity." *United States v. Ciampa,* 793 F.2d 19, 22 (1st Cir. 1986).

◼ There is no requirement that any precise number of descriptive factors of a suspect be present to give rise to probable cause. "The quality of [a] description, of course, will depend upon the opportunity victims and witnesses had to view the perpetrator, their skills of recall and reporting, and the time the police are able to spend assembling a description before undertaking the search for the criminal. . . . As a general proposition, . . . the greater number of these identifying characteristics which are available, the more likely it is that there will be grounds to arrest a person found with all or most of those characteristics. . . . The fundamental question . . . is whether the description is so detailed that it is not 'equally applicable to a great many individuals in the area.'" LaFave, 1 *Search and Seizure,* § 3.4(c)(1). *See United States v. Nash,* 946 F.2d 679, 681 (9th Cir.1991). "If a victim or witness is also able to give some description of the vehicle in which the offender or offenders escaped, this substantially increases the chances that probable cause will exist. This is because vehicles may usually be more precisely described than people. The clearest case, of course, is when the license number of the vehicle is provided; when such occurs, there will almost inevitably be probable cause without regard to the other circumstances of the case." LaFave, *supra,*

§ 3.4(c)(1). See also *State v. Dennis,* 189 Conn. 429, 456 A.2d 333, 335 (1983).

◼ Even if the Barnstable police did not have probable cause to arrest when they stopped Tomczak, they did when, after being warned of his *Miranda* rights, Tomczak admitted to having been in the area of Craigville Beach at or about the time the girls said they had been approached. As such, Tomczak's claim that his subsequent detention was illegal also fails. While I agree that there is a dispute of fact as to whether Tomczak voluntarily accompanied the police to the station, see *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980),[17] the dispute is immaterial to Tomczak's constitutional claim. Because police had probable cause to arrest Tomczak, they would have been justified in taking him into formal custody and forcibly removing him to the station.[18] That police chose a less intrusive alternative, and released Tomczak before seeking a judicial warrant, is not material. As far as I know, there is no constitutional right to be formally arrested at the earliest practicable moment. See *State v. Swanson,* 164 Wis.2d 437, 475 N.W.2d 148, 155 (1991). Indeed, in less compelling circumstances, it might have been to Tomczak's advantage that the police opted to test their evidence before committing themselves to a prosecution. Cf. *People v. Simon,* 45 Cal.2d 645, 648, 290 P.2d 531 (1955) (Traynor, J.). Accordingly, I hold that the stop of Tomczak's car and his subsequent detention did not violate his rights under the Fourth Amendment.

◼ Tomczak's third claim, that he was denied due process as a result of undergoing an unduly suggestive identification, fails because the identification was ultimately suppressed.[19] "The rule against admission of

---

17. The police say that Tomczak was told that he was free to go on his way. Tomczak says that he did not feel free to leave in the face of a request from armed uniformed officers. That Tomczak is a former Hartford, Connecticut police officer may be relevant to the issue of whether he was in fact intimidated by the officers' presence.

18. The fact that the police chose to justify their actions as an investigative stop rather than an arrest is irrelevant to the analysis. See *Sibron v.*

*New York,* 392 U.S. 40, 77, 88 S.Ct. 1889, 1908, 20 L.Ed.2d 917 (1968) (Harlan, J., concurring); *Commonwealth v. Hason,* 387 Mass. 169, 175, 439 N.E.2d 251 (1982); *Commonwealth v. Colitz,* 13 Mass.App.Ct. 215, 224, 431 N.E.2d 600 (1982).

19. From the record, it is impossible to know why the trial judge determined that the identifications were "unnecessarily suggestive." One-on-one identifications in the aftermath of a crime, even

evidence from an unduly suggestive lineup is a prophylactic rule designed to protect the core right [to a fair trial], ... and it is only the violation of the core right and not the prophylactic rule that should be actionable under Section 1983." *Hensley v. Carey,* 818 F.2d 646, 649 (7th Cir.1987). Because Tomczak suffered no prejudice from the identifications, he has no cause of action under § 1983.

Tomczak's claim against Det. Hall also fails. Det. Hall procured a valid arrest warrant from an impartial judicial officer based on facts that he accurately gathered from the children and the subsequent investigation.[20] Tomczak has not alleged that Det. Hall acted out of malice or that he procured the warrant by presenting false information to the Magistrate. Cf. *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Instead, Tomczak argues that Det. Hall should have inquired about his alibi before seeking the warrant. By this I take it to mean that Tomczak is accusing Hall of conducting a deficient investigation. Even were this true, allegations of mere negligence are insufficient to sustain a § 1983 action. *Davidson v. Cannon,* 474 U.S. 344, 347–348, 106 S.Ct. 668, 669–670, 88 L.Ed.2d 677 (1986); *Williams v. City of Boston,* 784 F.2d 430, 434 (1st Cir.1986). Moreover, a criminal suspect has no constitutional right to a perfect investigation. See *Myers v. Morris,* 810 F.2d 1437, 1460 (8th Cir. 1987).[21] As such, Tomczak's arrest was made pursuant to a valid warrant and his constitutional rights were not abridged.

Similarly, Tomczak argues that the April 17th incident should have demonstrated to Det. Hall that he was innocent of the kidnapping charge thereby causing Hall to discontinue the prosecution.[22] Det. Hall had no power to do so. See *Thompson v. Olson,* 798 F.2d 552, 556 (1st Cir.1986). The complaint and warrant had issued almost a month before. Once the case was committed to the court, the police had neither the ability nor the authority to take it upon themselves to enter a nolle prosequi. That power belonged exclusively to the District Attorney. See *Garcia v. City of Chicago, Ill.,* 24 F.3d 966, 971 (7th Cir.1994). Cf. *Baker v. McCollan,* 443 U.S. 137, 145–146, 99 S.Ct. 2689, 2694–2695, 61 L.Ed.2d 433 (1979).

This case is not a chronicle of the abuse of a criminal suspect's constitutional rights. The undisputed facts offer instead an example of what the Constitution expects of police officers. While I do not minimize the embarrassment caused Mr. Tomczak by his arrest and trial, the law ultimately worked to vindicate him as it is supposed to when proof of a crime falls short of proof beyond a reasonable doubt. The law worked in no small part because of the scrupulousness with which the accused officers conducted themselves. Not every arrest on probable cause will result in a conviction, nor should it. We expect police to react rapidly to complaints of a possible crime. Indeed, that expectation is what underlies the doctrine of probable cause. Police work is difficult enough without imposing

those involving a person obviously in custody, are not necessarily disfavored. See *Simmons v. United States,* 390 U.S. 377, 384–385, 88 S.Ct. 967, 971–972, 19 L.Ed.2d 1247 (1968). I also note that an identification subject to per se exclusion under Massachusetts law might nonetheless be deemed "reliable" under federal law. Compare *Commonwealth v. Johnson,* 420 Mass. 458, 650 N.E.2d 1257 (1995) (discussing *Commonwealth v. Botelho,* 369 Mass. 860, 343 N.E.2d 876 (1976)) with *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

20. It is unclear whether the evidence presented to the Magistrate included the station house identifications. Even without them, there was probable cause for issuance of an arrest warrant. Cf. *United States v. Veillette,* 778 F.2d 899, 903–904 (1st Cir.1985).

21. Even if there were such a right, Tomczak admits that on March 25, when he called Lt. Hoxie, he had no actual alibi information to give the police and that he refused thereafter to provide police with any information regarding his alibi.

22. Tomczak also argues that he was denied access to exculpatory evidence because his lawyer did not learn of Pisacano's second reported sighting of his car until he attended a pretrial conference. The record shows, however, that Tomczak's lawyer was told of the incident eleven days after it occurred and seven months before Tomczak's trial. This slight delay did not prejudice his defense as demonstrated by the fact that Tomczak subpoenaed the manager of the car storage facility to testify at the trial. See *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963).

unreasonable demands of perfection on every judgment officers are expected to make in ambiguous circumstances. Given what they knew, had these officers done less, they would be justifiably open to criticism for neglecting their duty. Here the police tempered a swift reaction with a deliberate confirmatory investigation and recourse to a judicial officer. For that they deserve praise, not condemnation.

■ Tomczak has also brought a pendent defamation claim against the defendants for the fact that a notice of his arrest was published in a local newspaper.[23] The newspaper gleaned the information from the Barnstable police daily log. Daily police logs are public records. See M.G.L. c. 41, § 98F. Tomczak has made no allegation, let alone proffered evidence, that the police disseminated any information other than information accessible to the public as a matter of right. In addition, Tomczak has failed to show that the police had any privilege to withhold the information. See *Correllas v. Viveiros,* 410 Mass. 314, 319, 572 N.E.2d 7 (1991). Tomczak, in other words, has failed to allege sufficient evidence to show the elements of a defamation claim.

### *ORDER*

For the foregoing reasons, the defendants' motion for summary judgment is *ALLOWED.*

SO ORDERED.

---

**23.** Tomczak does not allege that any other publi-  cation occurred.