**Peter DUCA, Plaintiff,**

v.

**Arthur MARTINS, Alan Nardini, Craig Davis, Paul Shastany, and Edward Yarosz, Defendants.**

**Charles ESPANET, Plaintiff,**

v.

**Arthur MARTINS, Alan Nardini, Craig Davis, Paul Shastany, and Edward Yarosz, Defendants.**

**C.A. Nos. 90–10349–WF, 90–10350–WF.**

United States District Court,
D. Massachusetts.

Aug. 20, 1996.

---

**9.** *See* 2 U.S.C. § 441b(a).

Peter Duca, Ashland, MA and Charles Espanet, Hopedale, MA, Plaintiffs Pro Se, and Lauren P. Smith, Stewart T. Herrick & Associates, Framingham, MA, for Plaintiffs.

Phillip B. Benjamin, Bikofsky & White, Framingham, MA, for Arthur Martins, Alan Nardini, Craig Davis, Paul Shastany, Edward Yaros, Defendants.

Peter D. Stanton, Law Offices of Mainini & Mainini, Framingham, MA, and Craig S. Orent, Bingham, Dana & Gould, Framingham, MA, for Jon Robinson, Defendant.

### MEMORANDUM AND ORDER

WOLF, District Judge.

Plaintiffs brought these actions, pursuant to 42 U.S.C. § 1983, against members of the Framingham, Massachusetts Police Department, alleging violations of their constitutional rights and violations of the Massachusetts Civil Rights Act, M.G.L. ch. 12 § 11I. Plaintiffs also make various claims under Massachusetts tort law, including false arrest, false imprisonment, malicious prosecution, abuse of process, and defamation.[1] The cases were consolidated on April 5, 1991. Defendants have subsequently moved for summary judgment on all counts in plaintiffs' amended complaints. A hearing was held on January 24, 1996. For the reasons stated below, defendants' motions for summary judgment on plaintiffs' federal and state civil rights claims are meritorious and are, therefore, being allowed. Plaintiffs' remaining pendent state law claims are being dismissed without prejudice to their being reinstituted in the courts of the Commonwealth of Massachusetts.

## I. FACTS

Unless otherwise indicated, the undisputed facts include the following.

### A. Investigation and Arrest of Duca and Espanet

During the relevant time period, from 1986 to early 1987, Plaintiff Peter Duca was the general manager/operator of Jessica's Restaurant ("Jessica's") in Framingham, Massachusetts. The restaurant was also popularly known as "Duca's." Plaintiff Charles Espanet was the manager of Jessica's. Also during that time, defendant Arthur Martins was the Chief of Police of Framingham. Defendant Alan Nardini was the Captain of the Detective Bureau of the Framingham Police Department. Defendants Craig Davis, Paul Shastany, and Edward Yarosz were Detectives in the Framingham Police Department.

Between July 1986 and February 1987, the Detective Bureau of the Framingham Police Department instituted "Operation Lost Call," a broad-scale drug investigation which targeted alleged sales of cocaine at several restaurants and lounges in Framingham. Jessica's was a subject of the investigation. In their investigation of Jessica's, the police employed John Robinson as a confidential informant. Robinson was used by the police to make "controlled buys" of cocaine at Jessica's. The "controlled buys" were all done in a similar fashion. Shastany and Davis (sometimes as a pair, sometimes individually paired with other detectives) would meet Robinson prior to his entering Jessica's and search him for money or contraband. When satisfied that Robinson had neither money nor contraband on his person, the detectives would provide Robinson with a certain sum of money with recorded serial numbers. The detectives would wait in or around the parking lot of Jessica's and watch Robinson enter

---

1. Specifically, in Count I of their respective amended complaints, plaintiffs Duca and Espanet seek relief under 42 U.S.C. § 1983. In Count II, both plaintiffs assert a claim for false arrest. In Count III, both plaintiffs assert a claim for false imprisonment. In Count IV, both plaintiffs assert a claim for intentional infliction of emotional distress. In Count V, both plaintiffs assert a claim for defamation. In Count VI, both plaintiffs assert a claim for abuse of process. In Count VII, both plaintiffs assert a claim for malicious prosecution. Finally, in Count VIII of his amended complaint, Duca brings a claim under the Massachusetts Civil Rights Act, M.G.L. ch. 12 § 11I.

Jessica's through a public entrance. When Robinson exited Jessica's, he would immediately turn over any cocaine on his person to the waiting detectives and then submit to a search. All items on his person would be tagged and recorded, and any chemical substances which he carried would be sent to a state laboratory for testing.

Between November 1986 and January 1987, Robinson made seven controlled buys of cocaine at Jessica's. On November 6, 1986, on two separate occasions, Robinson exited Jessica's with cocaine and reported that he had purchased the cocaine from the cook at Jessica's, Bruce Salamone. The second purchase was reportedly in Duca's office with Duca present.[2] On that night, the Framingham police had placed Detective William Delaney inside Jessica's for the purpose of corroborating Robinson's version of events. Robinson reported that Delaney witnessed the first purchase. In his report, Delaney does not state that he saw Robinson purchase cocaine from Salamone.

On November 23, 1986, Robinson reported a purchase of cocaine from Salamone and Espanet. On November 28, 1986, Robinson reported a purchase of cocaine from Duca, Espanet, and Salamone. On December 5, 1986, Robinson reported a purchase from Duca and Salamone. On January 7, 1987, Robinson reported a purchase of cocaine from Espanet and Salamone. On January 16, 1987, Robinson reported a purchase of cocaine from Espanet. These controlled buys were conducted without an inside surveillant. On January 29, 1987, Steven Murphy, an undercover agent for the United States Drug Enforcement Agency, accompanied Robinson to Jessica's. Murphy and Robinson did not report a purchase at Jessica's on that occasion.

Based upon this information, the detectives sought, and were issued, arrest warrants for Duca and Espanet by a magistrate on February 11, 1987.[3] On the same day, Framing-

ham police "raided" Jessica's and arrested Espanet, Salamone, and a bartender. Also on February 11, 1987, Duca was arrested at his home in Ashland, Massachusetts and was immediately taken to Jessica's, arriving shortly after the arrests had been made at Jessica's.

The local news media was present at Jessica's at the time of the arrests and at the time of Duca's arrival on the scene. At that time, defendant Shastany made the following statement to the media:

> The Manager, the Bartender and Cook were all selling cocaine at this establishment here. As a result of information received from prominent members of the community we initiated an investigation, planted an undercover operative and were successful in making buys from all the people I mentioned.

Plaintiffs' Exhibit 7. In addition, Lieutenant Brent Larrabee, who is not a defendant in this case, stated that "[t]his is a bar that was organized, had different levels of management in it, the different levels of management were selling cocaine ... they controlled some of the flow of narcotics within the Framingham area." *Id.*

On December 8, 1987, a probable cause hearing was conducted in Framingham District Court. The court found probable cause as to both Duca and Espanet. After criminal trials in Superior Court in 1989, both Duca and Espanet were acquitted of all criminal charges.

## B. *Yarosz's Investigation and Filing of Charges Against Duca*

Duca also alleges constitutional violations and torts arising out of a separate incident involving Yarosz. In January 1987, Yarosz was investigating a stabbing incident which had occurred at or near Jessica's. Duca had previously testified before a grand jury about the incident and had been granted immunity

---

**2.** Subsequent criminal charges brought against Duca did not include this event.

**3.** During the course of discovery, defendants were unable to locate the affidavits which supported the February 11, 1987 warrant applications. At oral argument, however, plaintiffs

agreed for the purposes of summary judgment that the information set forth in the police reports detailing the controlled buys was properly placed before the magistrate when application for the arrest warrants was made. *See* Defendants' Exhibits 3A–3G.

for his testimony. According to Yarosz's signed police report, he sought to ask Duca some further questions about "information received from Matthew Gutwell that he has been drinking at Jessica's and the Sports Bar over the past year, even though he was under 21 years of age". Plaintiffs' Exhibit 18. Gutwell was at Jessica's on the night of the stabbing and was a potential eyewitness. Yarosz's was concerned about reports that Duca had told Gutwell to tell the police that the stabbing had occurred outside Jessica's. *Id.*

On January 21, 1987, Yarosz went to Jessica's to gather more information from Duca about the incident. In addition to acting on behalf of the Framingham Police Department on that occasion, Yarosz was also "acting as an Agent[ ] of the Selectmen in regard to the licensing of [Jessica's]." *Id.* When Yarosz arrived at Jessica's, Duca refused to speak to him, upon the advice of his attorney.[4] Deposition of Peter Duca ("Duca Deposition"), Plaintiffs' Exhibit 10, p. 44. According to Duca, Yarosz became angered, screamed at Duca, insisted that Duca speak to him without his lawyer present, and then left the premises. *Id.* After the incident at Jessica's, Duca and his attorney went to the

Framingham police station at Yarosz's request. According to Duca, he agreed to speak to Yarosz, provided that his attorney was present. *Id.* at 45. Yarosz disapproved of this arrangement, allegedly saying to Duca that "[y]ou got no goddamn rights." *Id.* As a result of 'these incidents, Yarosz filed a criminal complaint against Duca, pursuant to M.G.L. ch. 138 §§ 63 and 63A, for hindering a licensing investigation.[5] Despite statements to the contrary in their memorandum, plaintiffs conceded at oral argument that Duca was not arrested in connection with this complaint. Rather, he was summoned to court to defend himself against these charges. The charges were subsequently dismissed.

## II. DISCUSSION

### A. *Summary Judgment Standard*

Fed.R.Civ.P. 56(c) provides, in pertinent part, that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In determining the merits of a motion for summary

---

**4.** In his deposition, Duca's states, in pertinent part:

So they came and my lawyer, who I called, was also present, Martin Boudreau. They came into my office, and I was instructed not to say a word, instructed by and I did Martin Boudreau not to say a word, that it was my lawyer who did all the talking, which he did, and Hill and Yarosz got very aggravated. They wanted to talk to me, but they didn't want my lawyer there. They still wanted to talk to me. I never said one word. Not one word.

Deposition of Peter Duca, Plaintiffs' Exhibit 10, p. 44. Defendant Yarosz's signed version of the incident states, in pertinent part:

We asked that Peter Duca speak to us in regards to this investigation. Peter Duca was present with us, did not reply, his attorney Martin Boudreau said that he would answer for Peter Duca and said that Peter Duca would not answer any questions about this incident. We informed Attorney Boudreau that in this investigation we were also acting as Agents of the Selectmen in regard to the licensing of this Liquor Establishment. We advised both Peter Duca and Attorney Boudreau that if they did not answer questions in regard to this investigation, we would notify the Board of Selectmen in regards to this matter. Again we asked

Peter Duca and his Attorney to answer questions in regards to this investigation we were conducting. Attorney Boudreau again said they would not answer any questions.

Investigation Report of Yarosz, Plaintiffs' Exhibit 18.

**5.** M.G.L. ch. 138 § 63 states, in part:

The local licensing authorities or their agents may at any time enter upon the premises of a person who is licensed by them, and the commission or its agents may enter upon the premises of any holder of a license, permit or certificate of fitness under this chapter to ascertain the manner in which he conducts the business carried on under such license, permit or certificate....

M.G.L. ch. 138 § 63A states, in part:

Any person who hinders or delays any authorized investigator of the commission or any investigator, inspector or authorized agent of local licensing authorities in the performance of his duties ... or who refuses to give to such investigator, inspector or agent such information as may be required for the proper enforcement of this chapter, shall be punished by a fine of not less than fifty nor more than two hundred dollars or by imprisonment for not more than two months, or both.

judgment, the court should undertake two inquiries: (1) whether the factual disputes are genuine, and (2) whether any fact genuinely in dispute is material. *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." *Id.* As to whether a dispute about a material fact is "genuine", the court must determine whether "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990). At all times in making this assessment, "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party." *Stepanischen v. Merchants Despatch Transp. Corp.,* 722 F.2d 922, 928 (1st Cir. 1983).

### B. *Qualified Immunity*

Defendants claim that they are entitled to qualified immunity with respect to the constitutional violations alleged by plaintiffs. The Supreme Court has held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). By focusing on objective reasonableness, "[t]he Supreme Court's decision in *Harlow* effectively eliminates from the qualified immunity calculus consideration of a government actor's subjective state of mind." *Collins v. Marina–Martinez,* 894 F.2d 474, 478 n. 6 (1st Cir.1990).

The Supreme Court has established a two-step inquiry which a reviewing court should utilize in determining qualified immunity. First, a court must decide "whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). If a violation of a constitutional right is, in fact, asserted, the court should then determine whether the right was "clearly established" at the time of the relevant conduct.

As the Court explained in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the question of whether a constitutional right is "clearly established" at the time of the relevant conduct should not be analyzed at such a level of "generality" as "to bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow.*" *Anderson,* 483 U.S. at 639, 107 S.Ct. at 3039. Rather:

> [T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless that very action in question has previously been held unlawful ...; but it is to say that in light of pre-existing law the unlawfulness must be apparent.

*Id.* at 640, 107 S.Ct. at 3039. The Court of Appeals for the First Circuit has elaborated upon the circumstances in which a right may not be "clearly established":

> In some instances it may be unclear whether an alleged official action even potentially implicates the constitutional or statutory right relied upon.... On the other hand, the law regarding the alleged violation may have been clearly enunciated, but application of that law to the facts may be unclear.... Or, while the right allegedly violated may have been clear in general outline, it may have been unclear how that right would be balanced against competing rights or interests.

*Borucki v. Ryan,* 827 F.2d 836, 838 (1st Cir.1987). The Court of Appeals for the First Circuit more recently discussed these principles in *Singer v. State of Maine,* 49 F.3d 837, 845 (1st Cir.1995), explaining that:

> [T]he inquiry whether the right at issue was clearly established properly focuses

'not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged.' [citation omitted.] 'Moreover, the manner in which this [clearly established] right applies to the actions of the official must also be apparent.' [citation omitted.] '[I]f there is a 'legitimate question' as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity.' [citation omitted.]"

*Id.*

## C. Defendants Are Protected By Qualified Immunity With Respect to the Investigation and Arrest of Duca and Espanet.

■ Plaintiffs contend that the investigation and arrest of Duca and Espanet violated rights secured to them by the United States Constitution. The crux of plaintiffs' claim is that Duca and Espanet were improperly arrested without probable cause on the basis of information that was either fabricated or known to be false or incomplete. In support of this claim, plaintiffs point to the following alleged facts: (a) Delaney failed to corroborate Robinson's first two buys from Salamone; (b) Murphy failed to make a buy at Jessica's despite attempting to do so; (c) defendants did not have any independent corroboration of Robinson's reports; (d) defendants, in applying for arrest warrants, did not present to the magistrate evidence of Robinson's past record of reliability; and (e) defendants failed to follow proper investigatory techniques in making the seven controlled buys from Jessica's.[6]

■ The Supreme Court has stated that where, as here, investigators have obtained a warrant, "[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable ... will the shield of immunity be lost." *Malley v. Briggs,* 475 U.S. 335, 345, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986)

The Court of Appeals for the First Circuit has interpreted this standard to mean that "[a]n officer will be held liable for seeking an arrest warrant later found to be without probable cause only if there clearly was no probable cause at the time the warrant was requested." *Floyd v. Farrell,* 765 F.2d 1, 5 (1st Cir.1985). The court in *Floyd* explained that the qualified immunity standard "eliminates from consideration allegations about the official's subjective state of mind, such as bad faith or malicious intention, concentrating the inquiry upon the 'objective reasonableness' of the official conduct." *Id.* at 4 (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738). "[S]eeking an arrest warrant is 'objectively reasonable' so long as the presence of probable cause is at least arguable." *Floyd,* 765 F.2d at 5. "[T]he objective reasonableness determination is for the judge to make, not for the jury." *Hall v. Ochs,* 817 F.2d 920, 924 (1st Cir.1987).

Even when viewed in the light most favorable to the plaintiffs, the undisputed facts indicate that a reasonable factfinder could not conclude that there clearly was no probable cause for the warrants. The police records, detailing controlled purchases of cocaine from Duca on two occasions and from Espanet on four occasions, provide a substantial basis on which a police officer could have reasonably believed that seeking an arrest warrant was appropriate in the circumstances. In other words, probable cause in this situation was "at least arguable." *Floyd,* 765 F.2d at 5.

■ Plaintiffs appear to contend that the defendants' failure to provide the magistrate with evidence of Robinson's historical reliability as an informant precludes a finding of probable cause. This contention is erroneous. Under the Supreme Court's "totality of the circumstances" test, there are no specific or mechanical requirements which an informant must meet. *Illinois v. Gates,* 462 U.S. 213, 230–31, 103 S.Ct. 2317, 2328–29, 76

---

6. For example, plaintiffs claim that defendants, from their surveillance position outside Jessica's, could not view all the means of ingress and egress to the establishment; that the defendants failed to obtain fingerprints from the matchbooks in which Robinson carried the cocaine; that

defendants failed to obtain search warrants for Jessica's and Peter Duca's residence; that defendants failed to arrange for a body wire to be placed on Robinson or a wire tap to be placed on Jessica's telephones.

L.Ed.2d 527 (1983). Indeed, the Court of Appeals for the First Circuit has specifically rejected plaintiffs' argument that an informant's previous "track record" must be demonstrated. *See United States v. Taylor,* 985 F.2d 3, 6 (1st Cir.1993) ("[A]n informant's reliability need not invariably be demonstrated through the detailed narration of the information previously furnished to law enforcement"); *United States v. Cochrane,* 896 F.2d 635, 641 (1st Cir.1990) ("[A] warrant affidavit [need not contain] an averment of previous reliability, the appropriate inquiry always being whether the informant's present information is truthful or reliable."). The court in *Cochrane* explained that "an important indicia of reliability is the fact that the informant's knowledge was based upon personal observation rather than hearsay." *Cochrane,* 896 F.2d at 641. In the present case, Robinson's information was the product of what a police officer could have reasonably believed was direct personal observation.

■ In addition, under Massachusetts law, no previous "track record" demonstration is required. Rather, a controlled buy, in and of itself, imbues an informant's statements with adequate reliability for the purposes of establishing probable cause. *See Commonwealth v. Desper,* 419 Mass. 163, 168, 643 N.E.2d 1008 (1994) (two "controlled buys" satisfied "veracity" requirement of Massachusetts law and established probable cause even when there were arguable defects in the controlled buy.); *Commonwealth v. Warren,* 418 Mass. 86, 89, 635 N.E.2d 240 (1994) ("[a] controlled purchase of narcotics, supervised by the police, provides probable cause to issue a search warrant.").

■ Plaintiffs claim that a *Floyd* probable cause analysis neglects an essential element of their constitutional claim; namely, that defendants fabricated the evidence put before the magistrate or, at least, proceeded with a reckless disregard for the truth in seeking an arrest warrant. Such a claim, if supported by sufficient facts, is viable under § 1983. *See Krohn v. United States,* 742 F.2d 24, 31–32 (1st Cir.1984); *Hervey v. Estes,* 65 F.3d 784, 788 (9th Cir.1995); *Snell v. Tunnell,* 920 F.2d 673, 698 (10th Cir.1990); *Magnotti v. Kuntz,* 918 F.2d 364, 368 (2nd Cir.1990). In *Krohn,* the Court of Appeals for the First Circuit explained:

> Essentially ... [this] claim[ ] allege[s] the constitutional violation recognized in *Franks v. Delaware,* [438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) ], where the Court held that a warrant issued upon a magistrate's finding of probable cause is nevertheless invalid, and the evidence obtained thereunder may be suppressed, if the affiant made intentional or reckless misrepresentations or misstatements which were necessary to that finding.

*Krohn,* 742 F.2d at 26. The court proceeded to equate the showing a criminal defendant must make under *Franks* to the showing a plaintiff must make in defeating qualified immunity. *Id.* at 31. Other courts of appeals have since done the same. *See, e.g., Branch v. Tunnell,* 937 F.2d 1382, 1386 (9th Cir.1991) ("[t]he *Franks* standard, although developed in the criminal context, 'also defines the scope of qualified immunity in civil rights actions.'" (quoting *Rivera v. United States,* 928 F.2d 592, 604 (2nd Cir.1991)); *Snell,* 920 F.2d at 698.

■ The Court of Appeals for the First Circuit has held that "[a] *Franks* hearing is required only if the defendant makes a 'substantial preliminary showing (1) that a false statement in the affidavit has been made knowingly and intentionally, and (2) that the false statement is necessary for the finding of probable cause.'" *United States v. Scalia,* 993 F.2d 984, 986–87 (1st Cir.1993) (quoting *United States v. Paradis,* 802 F.2d 553, 558 (1st Cir.1986)). The court went on to hold that "a comparable showing is required if the defendant would establish that technically accurate statements have been rendered misleading by material omissions." *Id.* at 987. An omission is not material if "even had the omitted statement been included in the affidavit, there was still probable cause to issue a warrant." *United States v. Rumney,* 867 F.2d 714, 720–21 (1st Cir.1989), *cert. denied,* 491 U.S. 908, 109 S.Ct. 3194, 105 L.Ed.2d 702 (1989). Thus, if probable cause would have been found even in the event of full disclosure, defendants are entitled to qualified immunity.

In the present case, plaintiffs have failed to make the required "substantial preliminary showing" under either part of the *Franks* analysis. There is scant evidence in the record of intentional or reckless misleading of the magistrate. Indeed, plaintiffs do not point to any *specific* piece of information presented to the magistrate that is either a falsehood or half-truth. Of course, plaintiffs dispute the fact that Robinson ever purchased cocaine from them. However, as the Court in *Franks* made clear, "[t]he deliberate falsity or reckless disregard" that a court should consider "is only that of the affiant, not of any nongovernmental informant." *Franks*, 438 U.S. at 171, 98 S.Ct. at 2684. In short, there is no evidence that the defendants failed to accurately and completely relay to the magistrate the information and evidence which Robinson had provided to them.

The crux of plaintiffs' complaint, therefore, appears to be that the defendants demonstrated intentional or reckless disregard for the truth of Robinson's statements through their awareness of "inconsistent" evidence and through their failure to perform an adequate investigation. First, plaintiffs point to the fact that Detective Delaney was unable to corroborate Robinson's first two controlled buys. However, with regard to the first controlled buy, there are many reasonable explanations for Delaney's failure to corroborate Robinson's story. Drug transactions are typically structured to be fast, concealed, and difficult to detect, especially from the perspective of someone, like Delaney, who is required to behave like an ordinary customer at a bar.[7] Likewise, Delaney's failure to corroborate Robinson's second buy from Salamone would not have appeared suspicious to a reasonable police officer. Robinson stated that this purchase took place inside Duca's office and presumably beyond Delaney's line of sight. Similarly, Agent Murphy's failure to purchase narcotics at Jessica's on an entirely separate occasion is not inconsistent with Robinson's alleged previous successes. These matters do not, individually or cumulatively, constitute "substantial" evidence of intentional or reckless disregard for the truth.

The alleged investigative inadequacies leading up to Duca and Espanet's arrest also fall short of the "substantial" showing of intentional or reckless disregard required under *Franks*. The typical *Franks* analysis concerns itself with a deliberate or reckless withholding of exculpatory evidence from a magistrate, not a mere failure to gather such evidence. "There is no constitutional or statutory requirement that before an arrest can be made the police must conduct a trial." *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 439 (7th Cir.1986) (quoting *Morrison v. United States*, 491 F.2d 344, 346 (8th Cir.1974)). "Moreover, a criminal suspect has no constitutional right to a perfect investigation." *Tomczak v. Town of Barnstable*, 901 F.Supp. 397, 403 (D.Mass.1995). Defendants' failure to track down certain evidence may arguably have been careless or unprofessional. However, "allegations of mere negligence are insufficient to sustain a § 1983 action." *Id.* Furthermore, the fact that the controlled buys in this case may not have been completely airtight does not suggest that plaintiffs intentionally or recklessly disregarded the truth. The basic integrity of the controlled buy technique as employed in this case remains unimpeached by the plaintiffs.

Even if all of the information alluded to by the plaintiffs had been included with defendants' application for arrest warrants, the magistrate's determination of probable cause would not have been altered. Delaney's failure to corroborate Robinson's first two buys is immaterial. Robinson's first buy was from Salamone. Presumably, it did not influence the magistrate's decision to grant an arrest warrant for Duca and Espanet. Robinson's second buy was also from Salamone and out of Delaney's view. With regard to Murphy's failure to make a controlled buy, the Court of Appeals for the First Circuit's remarks in *United States v. Higgins*, 995 F.2d 1 (1st Cir.1993) are also

---

7. Defendant Shastany explained in his deposition that "[t]hey are magicians doing slight of hand. This is a real quick way ... quick way of passing drugs back and forth designed to look like hand- shakes or almost look like somebody is just brushing by, and it is not uncommon for people not to see it." Deposition of Paul Shastany, pp. 118–19.

applicable to the instant case: "[T]he [unsuccessful] controlled purchase incident is not necessarily inconsistent with any of the other events recounted in the warrant affidavit. Thus, even if the affidavit had included an account of the incident, there were still ample grounds for a finding of probable cause." *Id.* at 4. Furthermore, almost all of the alleged investigative inadequacies (e.g., failure to corroborate Robinson's version of events, failure to maintain inside surveillance, failure to obtain search warrants) would have been evident to the magistrate (due to a lack of evidence from these sources) when the original decision to issue arrest warrants was made. An explicit explanation of these matters would have had no effect on the magistrate's decision. The alleged inadequacies that would not have been readily apparent to the magistrate (e.g., the presence at Jessica's of multiple means of ingress and egress) are not so significant that they would have overwhelmed the substantial evidence supporting probable cause. The probable cause standard concerns itself with "fair probabilit[ies]," not factual certainties. *United States v. Jordan,* 999 F.2d 11, 13 (1st Cir. 1993).

▮ Despite their inability to point to any specific falsehoods or omissions which, when taken separately or together, would constitute the "substantial preliminary showing" required by *Franks,* plaintiffs urge the court to adopt a "conspiracy" approach to their evidence. Plaintiffs argue that the lack of corroboration, the choice not to use internal surveillance, and the decision not to investigate various sources, when considered together, suggest that the entire controlled buy operation was a device designed to produce a pre-determined result. Plaintiffs' argument is, however, not persuasive because the evidence is insufficient to permit a reasonable factfinder to infer that a willful conspiracy existed. "A party may not cry 'con-

spiracy' and throw himself on the jury's mercy." *Gramenos,* 797 F.2d at 436. Nor may a jury return a verdict for a plaintiff based on mere speculation. If defendants were required to go to trial in this case on the basis of plaintiffs' conjecture, one of the primary purposes behind qualified immunity doctrine, discouraging "insubstantial suits against government officers," would be frustrated. *Krohn,* 742 F.2d at 31.

### D. Defendant Shastany is Protected By Qualified Immunity With Respect to His February 11, 1987 Statement to the Press.

▮ Plaintiffs claim that the statement made by Detective Shastany immediately after Duca and Espanet's arrest constitutes a violation of their rights remediable under § 1983.[8] Plaintiffs appear to rely on a constitutional defamation theory. In response, Shastany raises a qualified immunity defense.

▮ In general, a person's charge of defamation, "standing alone and apart from any other governmental action with respect to him," does not state a claim for relief under § 1983. *Paul v. Davis,* 424 U.S. 693, 694, 96 S.Ct. 1155, 1157, 47 L.Ed.2d 405 (1976). The Court of Appeals for the First Circuit has interpreted *Paul* to mean that, in order for a defamation claim to be actionable under § 1983, any "injury to reputation must be accompanied by a change in the injured person's status or rights (under state or federal law)." *Beitzell v. Jeffrey,* 643 F.2d 870, 878 (1st Cir.1981).

The question presented in this case is whether it was "clearly established" in 1987 that the arrest of Duca and Espanet would constitute the "plus" required under *Paul.*'s "defamation-plus" standard so as to defeat

---

**8.** Plaintiffs argue that Larrabee's statements on February 11, 1987 should be attributed to defendant Martins. There is no basis for this claim. As the Court of Appeals for the First Circuit has held, "[a] supervisor 'may be found liable [under § 1983] only on the basis of [his] own acts or omissions' [citation omitted].... [T]here must be 'an affirmative link' between the street-level misconduct and the action, or inaction, of super-

visory officials [citation omitted]." *Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553, 562 (1st Cir.1989). Plaintiffs' evidence suggests only that Larrabee reported to Martins on a regular basis. There is no evidence in the record that Martins explicitly or implicitly authorized or approved the particular statements made by Larrabee on February 11, 1987.

Shastany's defense of qualified immunity.[9] The uncertainties on this question in both Supreme Court and First Circuit caselaw compel the conclusion that plaintiffs have not proven Shastany is not entitled to qualified immunity. It appears that by 1987 only one court of appeals had specifically held that defamation accompanied by an *illegal* arrest could state a cause of action under § 1983. *See Marrero v. City of Hialeah*, 625 F.2d 499, 519 (5th Cir.1980).[10] To date, the Court of Appeals for the First Circuit has not held that defamation accompanied by an arrest, illegal or otherwise, constitutes a violation remediable under § 1983. Nor has it signaled it would likely do so.

Moreover, there are additional reasons why plaintiffs have not alleged a violation of a "clearly established" right with regard to Shastany's statement. In *Paul v. Davis*, the Supreme Court in 1976 considered a § 1983 claim arising from allegedly defamatory statements made in a flyer distributed by the police to local merchants. Davis, who had been previously arrested and acquitted of shoplifting charges, was depicted on the flyer as an "Active Shoplifter". In rejecting his claim, the Court stated:

> If respondent's view is to prevail, a person arrested by law enforcement officers who announce that they believe such person to be responsible for a particular crime in order to calm the fears of an aroused populace, presumably obtains a claim against such officers under § 1983.... It is hard to perceive any logical stopping place to such a line of reasoning.

*Paul*, 424 U.S. at 698, 96 S.Ct. at 1159. It is significant that the Court chose to describe a situation analogous to the present case to illustrate a constitutionally permissible comment. This statement alone demonstrates that Shastany's remark did not in 1987 violate a "clearly established" constitutional right.

Indeed, it remains unclear today whether plaintiffs' defamation claim states a cause of action under § 1983. *See Celia v. O'Malley*, 918 F.2d 1017 (1st Cir.1990). In *Celia*, plaintiff claimed that he was injured by defamatory remarks made by prosecutors and police officers during the course of a criminal investigation. The court denied his § 1983 claim with respect to these statements, explaining that:

> Celia had not alleged facts sufficient to establish a connection between the *alleged constitutional violation* (viz., the right not to be tried without indictment) and the prosecutors' defamatory statements.... The complaint thus fails to establish the necessary nexus between the purported *independent constitutional violation* and the defamatory statements, and, therefore, does not state a claim under § 1983.

*Celia*, 918 F.2d at 1021 (emphasis added). In *Celia*, the First Circuit distinguished both *Marrero* and *Gobel*, explaining that "in both of these cases, the alleged defamatory remarks were closely connected, in timing and in substance, to the *independent constitutional violation*." *Id.* (emphasis added). The language in *Celia* leaves the clear impression that the "plus" required under the *Paul* "defamation-plus" framework (at least in the non-employment law context) must be an "independent constitutional violation". In this sense, *Celia* appears to be inconsistent with *Beitzell* where the "plus" is described as merely a "change in the injured person's status or rights." *Beitzell*, 643 F.2d at 878.

The arguable inconsistency between *Celia* and *Beitzell* is relevant to the present case. As discussed previously, the arrest of Duca and Espanet did not for present purposes constitute an "independent constitutional violation."[11] As such, this case is distinguish-

---

**9.** In accordance with the Supreme Court's two-step analysis in *Siegert*, 500 U.S. at 232, 111 S.Ct. at 1793, the court assumes, without deciding, that "plaintiff has asserted a violation of a constitutional right at all." *Id.*

**10.** Since the decision in *Marrero*, at least one other court of appeals has held that an illegal arrest can constitute a "plus" under the "defa-

mation-plus" framework. *See Gobel v. Maricopa County*, 867 F.2d 1201, 1205 (9th Cir.1989).

**11.** The Court of Appeals for the First Circuit has suggested that, at least in Fourth Amendment cases where the focus is on the reasonableness of a police officer's actions, a determination that a defendant is entitled to qualified immunity is tantamount to a determination that no substantive violation has occurred. Thus, in *Roy v.*

able from both *Marrero* and *Gobel.* The plaintiffs in those cases asserted viable Fourth Amendment claims.[12]  In *Von Stein v. Brescher,* 904 F.2d 572 (11th Cir.1990), the Court of Appeals for the Eleventh Circuit distinguished *Marrero* on this precise point. In granting summary judgment for the defendants on plaintiff's constitutional defamation claim, the court stated, in language also applicable to the instant case: "While the defamatory statement in *Marrero* was made in connection with an illegal seizure, and therefore was clearly actionable under *Paul,* we have decided in this case that the Defendants in the instant case did not act unreasonably in arresting Plaintiff ..." *Von Stein,* 904 F.2d at 583.

Accordingly, Shastany is entitled to qualified immunity concerning his remarks.

### E. Defendant Yarosz is Protected By Qualified Immunity With Respect to His Filing of a Criminal Complaint Against Duca.

■ Duca asserts further constitutional violations arising out of his meetings with Detective Yarosz which led to Yarosz's application for a criminal complaint against Duca pursuant to M.G.L. ch. 138 § 63A. However, the facts presented by Duca, even if taken as true, do not demonstrate a violation of a "clearly established" constitutional right. Therefore, Yarosz is entitled to qualified immunity.

First, in 1987, it was not clearly established that Duca's Fourth Amendment rights were implicated as a result of a summons to appear in court to defend himself against criminal charges. *Compare Bacon v. Patera,* 772 F.2d 259, 265 (6th Cir.1985) (plaintiff who "was never arrested" was nonetheless "seized" under the Fourth Amendment when he was summoned to court on five occasions to defend himself against criminal charges) *with Nesmith v. Taylor,* 715 F.2d 194, 196 (5th Cir.1983) (declining to "decide whether a summons backed by threat of arrest could ever constitute a deprivation of liberty or a seizure").

Moreover, even if such a Fourth Amendment right were "clearly established," plaintiff has not offered evidence sufficient to prove that Yarosz behaved in an objectively unreasonable manner. It is "at least arguable" that probable cause supported Yarosz's application for a complaint. *Floyd,* 765 F.2d at 5. M.G.L. ch. 138 § 63A states, in pertinent part, that: "Any person ... who refuses to give to [a licensing] investigator, inspector

*Inhabitants of City of Lewiston,* 42 F.3d 691 (1st Cir.1994), the court explained:

> In theory, substantive liability and qualified immunity are two separate questions and, indeed, may be subject to somewhat different procedural treatment.  In police misconduct cases, however, the Supreme Court has used the same 'objectively reasonable' standard in describing both the constitutional test of liability [citing *Graham v. Connor* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989)] and the Court's own standard for qualified immunity.  [citing *Anderson,* 483 U.S. at 639, 107 S.Ct. at 3039].

*Roy,* 42 F.3d at 695.  *See also St. Hilaire v. City of Laconia,* 71 F.3d 20, 24 n. 2 (1st Cir.1995) (citing *Roy* for the proposition that, "at least in police misconduct cases, the objective reasonableness standard for liability is most likely the same as that for a qualified immunity defense"). In other contexts, however, an analysis of qualified immunity and an analysis of substantive liability may diverge significantly.  As demonstrated in the present section of this opinion, the typical non-Fourth Amendment qualified immunity analysis focuses on whether the particular right implicated is "clearly established."  In such a situation, courts often find that a particular constitutional right may have been violated, but that this right was not "clearly established" and, therefore, the defendant is entitled to qualified immunity.  *See, e.g., Rodriguez–Pinto v. Tirado–Delgado,* 982 F.2d 34, 38 (1st Cir.1993) (right to be free from politically motivated personnel action); *Rodi v. Ventetuolo,* 941 F.2d 22, 29–30 (1st Cir.1991) (inmate had right to certain procedural safeguards before being transferred); *Lanier v. Fair,* 876 F.2d 243, 250–54 (1st Cir.1989) (plaintiff had right to procedural safeguards with regard to reserve parole date).  In contrast, the focus in the usual Fourth Amendment qualified immunity analysis is not whether it is "clearly established" that an unreasonable search and seizure would violate the Constitution but rather whether a particular search and seizure was, in fact, unreasonable.

12. In *Marrero,* the court assumed that "the defamation was intimately connected with the unlawful arrest of appellants and the unlawful search and seizure of practically the entire inventory of their store."  *Marrero,* 625 F.2d at 517.  In *Gobel,* the court reversed the district court's dismissal of plaintiffs' Fourth Amendment claims.  *Gobel,* 867 F.2d at 1205.

or agent such information as may be required for the proper enforcement of this chapter, shall be punished . . ." When Yarosz met with Duca at Jessica's, Duca followed his attorney's instructions "not to say a word" to Yarosz, despite Yarosz's direct questioning. Duca Deposition, Plaintiffs' Exhibit 10, p. 44. A reasonable person in Yarosz's position could have interpreted Duca's silence as an intentional thwarting of his investigation under § 63 and, therefore, as punishable under § 63A.

There is no indication in the record that Duca's refusal to speak to Yarosz represented an assertion of his Fifth Amendment privilege against self-incrimination. Duca did not allude to such a concern in his deposition. Nor did he present this rationale in his submissions to the court or at oral argument. Indeed, it does not appear that Duca viewed Yarosz's questioning as an attempt to implicate him in any way. Rather, he stated:

> [T]hey wanted to talk to me about changing my testimony to the grand jury, saying that I did see the knife that stabbed the person, which I testified that I did not see the knife. I believe they wanted me to help them, cooperate with them and putting the person who committed the crime, Pete Hackett, away. They also wanted to me [sic] give them names of different people that might be drug dealers, which would be pure speculation on my part.

*Id.* at 46. The fact that Duca had been granted immunity for his testimony before the grand jury would have further alleviated any possible concerns a reasonable police officer may have had about Duca's Fifth Amendment rights. In short, Yarosz's conduct, in enforcing M.G.L. ch. 138 § 63A, was not objectively unreasonable.[13] While a fair question may exist concerning whether Yarosz acted in good faith in charging Duca, this question is not germane for the purposes of determining a police officer's qualified immunity. *See Malley,* 475 U.S. at 341, 106 S.Ct. at 1096 ("Under the *Harlow* standard . . . an allegation of malice is not sufficient to defeat

immunity if the defendant acted in an objectively reasonable manner."); *Collins,* 894 F.2d at 478 n. 6; *Floyd,* 765 F.2d at 4.

**F. Defendants Are Entitled to Qualified Immunity With Respect to Duca's Claim Under the Massachusetts Civil Rights Act.**

In *Duarte v. Healy,* 405 Mass. 43, 537 N.E.2d 1230 (1989), the Supreme Judicial Court of Massachusetts held that it is "consistent with the intent of the Legislature in enacting the Civil Rights Act to adopt thereunder the standard of immunity for public officials developed under § 1983." *Id.* at 46, 537 N.E.2d 1230. Accordingly, the court went on to hold that "public officials are not liable under the Civil Rights Act for their discretionary acts, unless they have violated a right under Federal or State constitutional or statutory law that was 'clearly established' at the time." *Id.* at 47, 537 N.E.2d 1230. The foregoing qualified immunity analysis concerning the plaintiffs' federal claims compels the conclusion that the defendants are entitled to qualified immunity on Duca's Massachusetts Civil Rights Act claim because he has not identified the violation of any right clearly established by state law. More specifically, the Massachusetts Civil Rights Act, M.G.L. ch. 12 § 11I has been interpreted to be co-extensive with § 1983 except that it requires the involvement of "threats, intimidation or coercion." *Batchelder v. Allied Stores Corp.,* 393 Mass. 819, 822–23, 473 N.E.2d 1128 (1985). Since defendants are entitled to qualified immunity on their federal claims, and Duca has not identified any distinct right clearly established by state law, defendants are also entitled to qualified immunity on his Massachusetts Civil Rights Act claim.

**G. Plaintiffs' Tort Law Claims Are Being Dismissed Without Prejudice**

While the court has the power to retain jurisdiction over plaintiffs' pendent

---

13. Yarosz's alleged statement that Duca has "got no goddamn rights" is not actionable under § 1983. "Verbal harassment and abusive language while 'unprofessional and inexcusable' are simply not sufficient to state a constitutional claim under Section 1983." *Crenshaw v. City of Defuniak Springs,* 891 F.Supp. 1548, 1555 (N.D.Fla.1995) (quoting *Patton v. Przybylski,* 822 F.2d 697, 700 (7th Cir.1987)).

state tort law claims, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). *See also Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988) ("[W]hen the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."). Since plaintiffs have no surviving federal claims, the court will exercise its discretion and dismiss plaintiffs' pendent state tort law claims without prejudice.[14]

## III. ORDER

In view of the foregoing, it is hereby OR-DERED that:

1. Defendants' motions for summary judgment on Counts I and VIII of Duca's amended complaint and on Count I of Espanet's amended complaint are ALLOWED.

2. Counts II, III, IV, V, VI, and VII of Duca and Espanet's amended complaints are dismissed without prejudice.

3. Plaintiffs' motion for a pretrial confer-ence is DENIED.

---

**14.** One of the factors a court should consider in deciding whether to dismiss pendent state law claims is whether the plaintiff would be time-barred from bringing the state law claims in state court upon their dismissal from federal court. *See, e.g., Pharo v. Smith,* 625 F.2d 1226, 1227 (5th Cir.1980). In the present case, the statute of limitations is not an important factor because, under the Massachusetts renewal statute, M.G.L. ch. 260 § 32, plaintiffs can pursue their state law claims in state court if they are filed within one year after their dismissal without prejudice from federal court. *See Liberace v. Conway,* 31 Mass. App.Ct. 40, 42–44, 574 N.E.2d 1010 *review denied,* 411 Mass. 1102, 579 N.E.2d 1361 (1991) (holding that M.G.L. ch. 260 § 32 applies to state law claims dismissed by federal court which had declined to exercise pendent jurisdiction.)